UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

| | |
|---|---|
| CHESTER COUNTY EMPLOYEES RETIREMENT FUND, Individually and on Behalf of All Others Similarly Situated, and Derivatively on Behalf of ROADRUNNER TRANSPORTATION SYSTEMS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> CURTIS W. STOELTING, JUDITH A. VIJUMS, SCOTT D. RUED, MARK A. DiBLASI, JAMES D. STALEY, CHRISTOPHER L. DOERR, JOHN G. KENNEDY, III, BRIAN C. MURRAY, WILLIAM S. URKIEL, MICHAEL P. WARD, IVOR J. EVANS, CHAD M. UTRUP, SCOTT L. DOBAK, RALPH W. KITTLE, III, PETER R. ARMBRUSTER and BRIAN J. VAN HELDEN, <br><br> Defendants, <br><br> – and – <br><br> ROADRUNNER TRANSPORTATION SYSTEMS, INC., a Delaware corporation, <br><br> Nominal Defendant. | Civil No. <br><br> DERIVATIVE ACTION <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br> DEMAND FOR JURY TRIAL |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF FEDERAL SECURITIES LAW, BREACH OF FIDUCIARY
DUTY, WASTE OF CORPORATE ASSETS AND UNJUST ENRICHMENT

Plaintiff Chester County Employees Retirement Fund, through its attorneys, submits this Verified Shareholder Derivative Complaint for Violation of Federal Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff, which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and news reports, press releases and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1. This is a shareholder derivative action brought on behalf of Roadrunner Transportation Systems, Inc. ("Roadrunner" or the "Company") against certain of its current and former officers and/or directors for breach of fiduciary duty, corporate waste, unjust enrichment and violation of federal securities law. Defendants' misfeasance has severely damaged this once-valuable franchise and has resulted in hundreds of millions of dollars in damage to Roadrunner's reputation, goodwill and standing in the business community. Worse yet, defendants' actions have caused the Company to face a complex and expensive-to-defend securities class action and exposed it to millions more in potential liability for violations of state and federal law.

2. Roadrunner provides logistics services designed to get its customers' products to market. These services include truckload logistics ("TL"), customized and expedited less-than-truckload ("LTL"), intermodal solutions, freight consolidation, inventory management, expedited services, air freight, international freight forwarding, customs brokerage, and transportation management solutions ("TMS"). Roadrunner's operations are classified as so-called "asset-light" because they use third-party transportation providers to provide their logistics services. For example, Roadrunner's initial Registration Statement on Form S-1 filed with the SEC on July 24,

2008, prior to the Company's initial public offering ("IPO"), stated that the Company's "principal strategy has been to develop a full-service transportation and logistics provider under a non-asset based structure through the integration and internal growth of complementary businesses."

3.  Put simply, Roadrunner utilizes a third-party network of transportation providers, comprising independent contractors and purchased power providers, with a focus on mid-size shippers. Roadrunner has several subsidiaries, including Morgan Southern, Inc. ("Morgan Southern"), which provides over-the-road ("OTR") trucking services, and M. Bruenger & Co., Inc. ("Bruenger"), which provides refrigerated and dry van carrier services. Roadrunner purchased Morgan Southern for $20 million and Bruenger for over $10 million in 2011, among several other companies. Roadrunner currently has 25 operating businesses under its control.

4.  HCI Equity Partners ("HCI") provides oversight of Roadrunner's various acquisitions and the corresponding debt financing for those acquisitions in exchange for fees and other remuneration. In total, Roadrunner has paid HCI over $3.5 million in advisory fees and remuneration from 2010 to 2015. Notably, HCI is a private equity firm that has owned an interest in Roadrunner since the Company's formation, and as of March 1, 2016, HCI and its affiliates held approximately 25% of Roadrunner's outstanding common stock. Additionally, HCI maintains a presence on the Roadrunner Board of Directors (the "Board") through defendants Ivor J. Evans, Scott D. Rued and Judith A. Vijums.

5.  Roadrunner's growth by acquisition strategy required the Company to purchase several companies between 2013 and 2016. However, the Company had to greatly increase its debt load and reduce cash flows to consummate these acquisitions. Ultimately, Roadrunner's revenues increased from $632 million in 2010 to almost $2 billion by 2015. But the foundation for this success was soon exposed as a hoax.

6.     The first inkling that things were not right came on November 10, 2016, when Roadrunner filed a Notification of Late Filing on Form 12b-25 with the SEC. This notice explained that the Company would not file its quarterly report for the third fiscal quarter of 2016 on time. The Company stated there were on-going accounting issues, including a mistake in the calculation of its cash flow leverage ratio associated with its covenants with lenders for the four fiscal quarters ending September 30, 2016. Thus, the Company would not be within its financial covenant for the four fiscal quarters ending September 30, 2016 without a waiver for non-compliance by the Company's lenders. The Company received such a waiver and filed its delinquent quarterly report with the SEC on November 14, 2016. Defendants thereafter repeatedly told shareholders that the Company's internal controls over its financial reporting were effective as of September 30, 2016.

7.     Defendants' duplicity was further revealed only a month and a half later when, on January 30, 2017, defendants caused Roadrunner to announce that the Company would restate all of its quarterly reports on Form 10-Q for the fiscal quarters ended March 31, 2014 through September 30, 2016 and annual reports on Form 10-K for the fiscal years ended December 31, 2014 and 2015. The Company stated that shareholders and investors could no longer rely upon any of the enumerated financial statements as well as the associated reports of Roadrunner's accountants at Deloitte & Touche LLP.

8.     The Company explained that the restatement was necessary because there were accounting discrepancies at its Morgan Southern and Bruenger subsidiaries. Specifically, Roadrunner acknowledged that errors had been made in the accounting of "unrecorded expenses from unreconciled balance sheet accounts, including cash, driver and other receivables, and line haul and other driver payables." The Company also admitted that its investigation could reveal that there were accounting errors within periods prior to those mentioned and estimated it would require

prior period adjustments to Roadrunner's results of operations of between $20 million and $25 million.

9.      Things only got worse when defendants caused the Company to file a January 30, 2017 Form 8-K with the SEC stating that the Company would be forced to record a non-cash goodwill impairment charge in the range of $175 million to $200 million associated with Roadrunner's acquisition of Morgan Southern and Bruenger.

10.     The January 30, 2017 disclosure caused Roadrunner's stock price to plunge more than 31%, or $3.62 per share, on January 31, 2017, to close at $7.92 per share, compared to the previous trading day's closing of $11.54 per share, erasing almost $138.8 million in shareholder equity. In addition, the broadening scope of harm to the Company and its reputation was highlighted by analysts at Stifel Financial who stated there was now a "strong negative bias" on the shares, as the future of the Company was "likely selling off pieces to pay back its lenders."

11.     In a conference call held on January 31, 2017 for investors and analysts, defendant Curtis W. Stoelting, the Company's Chief Executive Officer ("CEO"), admitted that "high levels of growth had put some stress and stretched the organization structure that was in place." Moreover, Stoelting highlighted the Company's lack of effective internal accounting controls and disclosure procedures when he admitted that the Company would have benefited from "more oversight from a corporate point of view."

12.     Defendants' unlawful conduct has now severely damaged the Company's reputation and goodwill. Worse yet, Roadrunner is now the subject of numerous complex and expensive-to-defend federal securities class action lawsuits filed in the U.S. District Court for the Eastern District of Wisconsin on behalf of investors who purchased Roadrunner shares alleging violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

13.     Although Roadrunner has been severely injured, defendants have not fared nearly so badly. In 2013, 2014 and 2015, defendants collectively pocketed millions of dollars in executive compensation and directors' fees not justified by Roadrunner's actual performance while under their stewardship. In addition, certain defendants have unlawfully reaped over $100 million in illegal insider trading proceeds. These payments and illicit proceeds unjustly enriched defendants at the Company's expense.

14.     Further, the Company has not held an Annual Meeting of Stockholders since May 18, 2016, more than 13 months ago. Nor has the Company filed a 2017 Proxy Statement. And despite this glaring failure, defendants improperly increased the Board's size to 12 members and appointed (without any annual meeting or election) two new directors to the Board on June 6, 2017.[1] Defendants' failure to hold an annual meeting is in violation of title 8, §211 of the Delaware General Corporation Law Code ("§211") and the Company's By-Laws. As a result, the Company's stockholders have not received updates directly from Roadrunner's Board and they have been unable to voice their frustrations at an annual meeting or by withholding their votes for these faithless fiduciaries.

15.     The Board's refusal to hold such a meeting is unsurprising. The last two annual Board elections, held in 2015 and 2016, were tainted. The proxy solicitation requesting stockholders vote in favor of re-electing to the Board defendants William S. Urkiel, Chad M. Utrup and Judith A. Vijums in 2015 and defendants Mark A. DiBlasi, John G. Kennedy, III and Scott D. Rued in 2016 contained materially false and misleading statements about the Board's oversight of risk, as well as the Company's internal control and disclosure procedures, particularly regarding its accounting practices. If the stockholders knew the truth about Roadrunner's continued lack of

---

[1]     On June 6, 2017, the Board appointed defendants Scott L. Dobak and Ralph W. Kittle, III to the Board.

internal controls and disclosure procedure failures, and its revenue and earnings recognition improprieties, stockholders would not have voted to re-elect the faithless fiduciaries.

16. Moreover, the Board has caused Roadrunner to violate §8 of the Clayton Act ("§8"), 15 U.S.C. §19, which prohibits a person from serving as a director or officer of two or more corporations that compete.[2] In particular (and again, despite not having a stockholder meeting), the Board approved and appointed defendant Dobak to the Board. Defendant Dobak is the current CEO of Dicom Transportation Group ("Dicom"), and has been since February 2014. Dicom is a competitor of Roadrunner, providing business-to-business expedited transportation services, including offering courier, LTL and truckload delivery services, as well as third-party logistics and TMS. Upon information and belief, Roadrunner's and Dicom's competitive annual sales exceed the statutory threshold.

17. Nevertheless, the Roadrunner's Board has not, and will not, commence suit against defendants for breach of fiduciary duty, waste of corporate assets and/or unjust enrichment, let alone vigorously prosecute such claims. By this action, plaintiff seeks to vindicate Roadrunner's rights against its wayward fiduciaries.

---

[2]  Specifically, §8 prohibits these interlocking directorships when: (i) the combined capital, surplus and undivided profits of each of the corporations exceeds $32,914,000; (ii) each corporation is engaged in commerce; and (iii) the corporations are competitors with certain threshold competitive annual sales. It contains three *de minimis* exceptions that do not apply here, namely if: (i) the competitive sales of either corporation are less than $3,291,400, according to the Federal Trade Commission's adjustment; (ii) the competitive sales of either corporation are less than 2% of that corporation's total sales; or (iii) the competitive sales of each corporation are less than 4% of that corporation's total sales. 15 U.S.C. §19(a)(2)(A)-(C). According to the statute, competitive sales are "the gross revenues for all products and services sold by one corporation in competition with the other, determined on the basis of annual gross revenues for such products and services in that corporation's last completed fiscal year." 15 U.S.C. §19(a)(2)(C). Total sales is further defined as "gross revenues for all products and services sold by one corporation over that corporation's last completed fiscal year." *Id.*

## JURISDICTION AND VENUE

18.     Pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act, this Court has jurisdiction over the claims asserted herein for violations of §14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder, as well as violations of §8 of the Clayton Act, 15 U.S.C. §19. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

19.     This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

20.     Venue is proper under 28 U.S.C. §1391(a) because Roadrunner maintains offices within this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

21.     Plaintiff Chester County Employees Retirement Fund has held Roadrunner shares continuously since at least 2014.

**Nominal Defendant**

22.     Nominal defendant Roadrunner is a Delaware corporation with principal executive offices located at 4900 South Pennsylvania Avenue, Cudahy, Wisconsin. Roadrunner works with independent contractors and third-party carriers to provide domestic, international air, and ocean transportation services to customers. Roadrunner's goal is to reduce operating costs for its customers, improve supply chain efficiency, redirect resources to core competencies, and enhance customer service. As of December 31, 2015, Roadrunner employed 4,502 personnel and operated more than 100 properties throughout the United States and Canada.

**Defendants**

23. Defendant Curtis W. Stoelting ("Stoelting") has been Roadrunner's CEO since April 2017 and a director since January 2016. Stoelting was also Roadrunner's President and Chief Operating Officer from January 2016 to April 2017. Stoelting knowingly, recklessly, or with gross negligence: (i) caused or allowed Roadrunner to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Roadrunner's accounting practices and operations. Stoelting's 2016 executive and director compensation, including incentive compensation, has not been fully disclosed due to the Company's failure to timely file its annual report and proxy statement with the SEC. However, Stoelting's compensation from Roadrunner is not justified by the Company's performance while under his stewardship.

24. Defendant Judith A. Vijums has been Roadrunner's Vice President since March 2007 and a director since March 2005. Vijums is a Managing Director at HCI and has been since 2003. The Company admits in its SEC filings that Vijums is not an independent director due to her relationship with HCI. Vijums knowingly, recklessly, or with gross negligence: (i) caused or allowed Roadrunner to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Roadrunner's accounting practices and operations.

25. Defendant Scott D. Rued served as Roadrunner's Chairman of the Board from March 2005 to July 2008 and from March 2010 until November 2017 and has been a director since March 2005. Rued is also the co-founder of HCI and a Managing Partner at the firm and has been since 2003. The Company admits in its SEC filings that Rued is not an independent director due to his relationship with HCI. Rued knowingly or recklessly: (i) caused or allowed Roadrunner to disseminate improper statements concerning the Company's financial performance; and (ii) failed

to maintain adequate internal controls and disclosure procedures with respect to Roadrunner's accounting practices and operations. During the relevant period and before the fraud was revealed, Rued sold 6.445 million shares of Roadrunner stock at artificially inflated prices based on material non-public information for total proceeds of $159,263,100.

26. Defendant Mark A. DiBlasi served as Roadrunner's Interim Vice Chairman of the Board from April 2017 to November 2017 and has served as a director since July 2006. Defendant DiBlasi was also Roadrunner's CEO from January 2006 to May 2017 and President from January 2006 to January 2016. Defendant DiBlasi is named as a defendant in the related securities class action complaints that allege he violated §§10(b) and 20(a) of the Exchange Act. Defendant DiBlasi knowingly, recklessly, or with gross negligence: (i) caused or allowed Roadrunner to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Roadrunner's accounting practices and operations. DiBlasi's 2016 executive and director compensation, including incentive compensation, has not been fully disclosed due to the Company's failure to timely file its annual report and proxy statement with the SEC. In 2013, 2014 and 2015, DiBlasi received $988,714, $1,037,316 and $1,214,173, respectively, in directors' fees and other compensation from Roadrunner. DiBlasi's compensation was not justified by the Company's performance while under his stewardship. During the relevant period and before the fraud was revealed, DiBlasi sold 179,177 shares of Roadrunner stock at artificially inflated prices based on material non-public information for total proceeds of $4,687,716.

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------|-------|
| 2015 | $543,885 | $661,534 | - | $8,754 | $1,214,173 |
| 2014 | $498,846 | $370,718 | $163,368 | $4,384 | $1,037,316 |
| 2013 | $457,308 | $424,402 | $98,580 | $8,424 | $988,714 |

27.    Defendant James D. Staley served as Roadrunner's Lead Director from November 2016 until November 2017, when he was named Chairman of the Board. Staley has been a director since October 2010. Staley knowingly or recklessly: (i) caused or allowed Roadrunner to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Roadrunner's accounting practices and operations. Staley's 2016 director compensation has not been fully disclosed due to the Company's failure to timely file its annual report and proxy statement with the SEC. In 2013, 2014 and 2015 Staley received $94,592, $84,345 and $98,649, respectively, in directors' fees and other compensation from Roadrunner. Staley's compensation is not justified by the Company's performance while under his stewardship.

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|-------------------|--------------|--------|
| 2015 | $38,000 | $60,649 | $98,649 |
| 2014 | $38,000 | $46,345 | $84,345 |
| 2013 | $38,000 | $56,592 | $94,592 |

28.    Defendant Christopher L. Doerr has been a Roadrunner director since October 2010. Doerr knowingly or recklessly: (i) caused or allowed Roadrunner to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Roadrunner's accounting practices and operations. Doerr's 2016 director compensation has not been fully disclosed due to the Company's failure to timely file its annual report and proxy statement with the SEC. In 2013, 2014 and 2015, Doerr received $91,592, $81,345 and $95,649, respectively, in directors' fees and other compensation from Roadrunner. Doerr's compensation is not justified by the Company's performance while under his stewardship.

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|-------------------|--------------|--------|
| 2015 | $35,000 | $60,649 | $95,649 |
| 2014 | $35,000 | $46,345 | $81,345 |
| 2013 | $35,000 | $56,592 | $91,592 |

29.     Defendant John G. Kennedy, III has been a Roadrunner director since December 2012. Kennedy was a member of Roadrunner's Audit Committee from at least April 2013 to at least April 2016. Kennedy knowingly or recklessly: (i) caused or allowed Roadrunner to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Roadrunner's accounting practices and operations. Kennedy's 2016 director compensation has not been fully disclosed due to the Company's failure to timely file its annual report and proxy statement with the SEC. In 2013, 2014 and 2015, Kennedy received $91,592, $81,345 and $95,649, respectively, in directors' fees and other compensation from Roadrunner. Kennedy's compensation is not justified by the Company's performance while under his stewardship.

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|-------------------|--------------|-------|
| 2015 | $35,000 | $60,649 | $95,649 |
| 2014 | $35,000 | $46,345 | $81,345 |
| 2013 | $35,000 | $56,592 | $91,592 |

30.     Defendant Brian C. Murray has been a Roadrunner director since August 2015. Murray was Chairman of Roadrunner's Audit Committee from August 2015 to at least April 2016. Murray knowingly or recklessly: (i) caused or allowed Roadrunner to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Roadrunner's accounting practices and operations. Murray's 2016 director compensation has not been fully disclosed due to the Company's failure to timely file its annual report and proxy statement with the SEC. In 2015, Murray received $15,583 in directors' fees and other compensation from Roadrunner. Murray's compensation is not justified by the Company's performance while under his stewardship.

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|------------------|--------------|-------|
| 2015 | $15,583 | $0 | $15,583 |

31.     Defendant William S. Urkiel has been a Roadrunner director since May 2010. Urkiel was a member of Roadrunner's Audit Committee from at least April 2013 to at least April 2016. Urkiel knowingly or recklessly: (i) caused or allowed Roadrunner to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Roadrunner's accounting practices and operations. Urkiel's 2016 director compensation has not been fully disclosed due to the Company's failure to timely file its annual report and proxy statement with the SEC. In 2013, 2014 and 2015, Urkiel received $96,592, $86,345 and $100,649, respectively, in directors' fees and other compensation from Roadrunner.   Urkiel's compensation is not justified by the Company's performance while under his stewardship.

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|------------------|--------------|-------|
| 2015 | $40,000 | $60,649 | $100,649 |
| 2014 | $40,000 | $46,345 | $86,345 |
| 2013 | $40,000 | $56,592 | $96,592 |

32.     Defendant Michael P. Ward has been a Roadrunner director since February 2016. Ward knowingly and recklessly: (i) caused or allowed Roadrunner to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Roadrunner's accounting practices and operations. Ward's 2016 director compensation has not been fully disclosed due to the Company's failure to timely file its annual report and proxy statement with the SEC.   However, Ward's compensation from Roadrunner not justified by the Company's performance while under his stewardship.

33.     Defendant Ivor J. Evans was a Roadrunner director from March 2005 to April 2014. Evans was Roadrunner's Chairman of the Board from July 2008 to March 2010. Evans was also

an Operating Partner at HCI from March 2005 to 2015. Evans knowingly or recklessly: (i) caused or allowed Roadrunner to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Roadrunner's accounting practices and operations.

34.     Defendant Chad M. Utrup was a Roadrunner director from May 2010 to September 2015. Utrup was the Chairman of Roadrunner's Audit Committee from at least April 2013 to August 2015 and a member from August 2015 to September 2015. Utrup knowingly or recklessly: (i) caused or allowed Roadrunner to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Roadrunner's accounting practices and operations. In 2013, 2014 and 2015, Utrup received $99,092, $88,845 and $94,399, respectively, in directors' fees and other compensation from Roadrunner not justified by the Company's performance while under his stewardship.

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|------|------|------|
| 2015 | $33,750 | $60,649 | $94,399 |
| 2014 | $42,500 | $46,345 | $88,845 |
| 2013 | $42,500 | $56,592 | $99,092 |

35.     Defendant Scott L. Dobak is a Roadrunner director and has been since June 2017. Dobak is the CEO of Dicom, a corporation in competition with Roadrunner. Dobak's interlocking directorate violates §8 of the Clayton Act.

36.     Defendant Ralph W. Kittle, III, is a Roadrunner director and has been since June 2017.

37.     Defendant Peter R. Armbruster was Roadrunner's Chief Financial Officer ("CFO"), Treasurer and Secretary from December 2005 to March 2017. Armbruster was also Roadrunner's Vice President of Finance from December 2005 to January 2015. Armbruster is named as a

defendant in the related securities class action complaints that allege he violated §§10(b) and 20(a) of the Exchange Act. Armbruster knowingly, recklessly, or with gross negligence: (i) caused or allowed Roadrunner to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Roadrunner's accounting practices and operations. Armbruster's 2016 executive compensation, including incentive compensation, has not been fully disclosed due to the Company's failure to timely file its annual report and proxy statement with the SEC. In 2013, 2014 and 2015, Armbruster received $583,936, $624,828 and $784,986, respectively, in executive and other compensation from Roadrunner. Armbruster's compensation is not justified by the Company's performance while under his stewardship. During the relevant period and before the fraud was revealed, Armbruster sold 189,852 shares of Company stock at artificially inflated prices based on material non-public information for total proceeds of $5,026,138.

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------|-------|
| 2015 | $335,192 | $441,040 | - | $8,754 | $784,986 |
| 2014 | $306,154 | $231,704 | $82,600 | $4,370 | $624,828 |
| 2013 | $281,154 | $248,975 | $45,743 | $8,064 | $583,936 |

38. Defendant Brian J. van Helden was Roadrunner's Chief Operating Officer from December 2013 to June 2015. Defendant van Helden knowingly, recklessly, or with gross negligence: (i) caused or allowed Roadrunner to disseminate improper statements concerning the Company's financial performance; and (ii) failed to maintain adequate internal controls and disclosure procedures with respect to Roadrunner's accounting practices and operations. In 2013 and 2014, van Helden received $608,860 and $756,413, respectively, in executive compensation, directors' fees and other compensation from Roadrunner not justified by the Company's performance while under his stewardship. During the relevant period and before the fraud was

revealed, van Helden sold 103,234 shares of Company stock at artificially inflated prices based on material non-public information for total proceeds of $2,739,969.

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------|-------|
| 2014 | $371,923 | $278,027 | $102,583 | $3,880 | $756,413 |
| 2013 | $296,154 | $248,975 | $55,815 | $7,916 | $608,860 |

## THE FIDUCIARY DUTIES OF ROADRUNNER'S OFFICERS AND DIRECTORS

39.     Each officer and director of Roadrunner owed the Company and its shareholders the duty to exercise a high degree of care, loyalty and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of Roadrunner's directors and officers complained of herein involves fraudulent misconduct – a knowing, intentional and culpable violation of their obligations as directors and/or officers of Roadrunner and the absence of good faith on their part concerning their duties to the Company and its shareholders. The misconduct of Roadrunner's officers has been ratified by Roadrunner's Board, which has failed to take any legal action on behalf of the Company against them.

40.     By reason of their positions as officers, directors and/or fiduciaries of Roadrunner and because of their ability to control the business and corporate affairs of Roadrunner, defendants owed Roadrunner and its shareholders fiduciary obligations of candor, trust, loyalty and care, and were required to use their ability to control and manage the Company in a fair, just, honest and equitable manner, and to act in furtherance of the best interests of Roadrunner and its shareholders, so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit. In addition, as officers and/or directors of a publicly held company, defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, projections and forecasts, (i) so as to fulfill their duty of candor and honesty to Roadrunner's

existing shareholders; and (ii) so that the market price of Roadrunner stock would be based on truthful and accurate information.

41.     Defendants, because of their positions of control and authority as Roadrunner's directors and/or officers, were able to and did, directly and indirectly, control the wrongful acts complained of herein.  Because of their executive and directorial positions with Roadrunner, each defendant had access to adverse non-public information about the financial condition, operations and future business prospects of Roadrunner and was required to disclose it promptly and accurately to Roadrunner shareholders and the financial markets, but did not do so.

42.     In addition to these duties, under the Audit Committee Charter, as members of the Audit Committee, defendants Kennedy, Murray, Urkiel and Utrup owed specific duties to Roadrunner to assist the Board in overseeing "the accounting and financial reporting processes of the Company and audits of the financial statements of the Company."  Moreover the Audit Committee's Charter provides that its members must assist the Board with respect to its oversight of the integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, the qualifications and independence of the Company's independent auditor, and the performance of the Company's internal audit function and independent auditor. Furthermore, the Audit Committee is required to "obtain and discuss with management . . . major issues as to the adequacy of the Company's internal controls and any specific audit steps adopted in light of material control deficiencies."  By virtue of such duties and by the terms of the Audit Committee Charter, the Audit Committee members of Roadrunner's Board were required, among other things, to:

**Purpose**

The purpose of the Audit Committee (the "Committee") shall be as follows:

1.     To oversee the accounting and financial reporting processes of the Company and audits of the financial statements of the Company.

2.     To provide assistance to the Board of Directors with respect to its oversight of the following:

    1.     The integrity of the Company's financial statements.

    2.     The Company's compliance with legal and regulatory requirements.

    3.     The qualifications and independence of the Company's independent auditor.

    4.     The performance of the Company's internal audit function and independent auditor.

3.     To prepare an audit committee report as required to be included in the Company's annual proxy statement by applicable rules and regulations of the Securities and Exchange Commission ("SEC").

\*    \*    \*

## Duties and Responsibilities

The Committee shall carry out the duties and responsibilities set forth below. These functions should serve as a guide with the understanding that the Committee may determine to carry out additional functions and adopt additional policies and procedures as may be appropriate in light of changing business, legislative, regulatory, legal, or other conditions. The Committee shall also carry out any other duties and responsibilities delegated to it by the Board of Directors from time to time related to the purposes of the Committee outlined in this Charter. The Committee may perform any functions it deems appropriate under applicable law, rules, or regulations, the Company's bylaws, and the resolutions or other directives of the Board, including review of any certification required to be reviewed in accordance with applicable law or regulations of the SEC.

In discharging its oversight role, the Committee is empowered to study or investigate any matter of interest or concern that the Committee deems appropriate. In this regard and as it otherwise deems appropriate, the Committee shall have the authority, without seeking Board approval, to engage and obtain advice and assistance from outside legal and other advisors as it deems necessary to carry out its duties. The Committee also shall have the authority to receive appropriate funding, as determined by the Committee, in its capacity as a committee of the Board of Directors, from the Company for the payment of compensation to any accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review, or attest services for the Company; to compensate any outside legal or other advisors engaged by the Committee; and to pay the ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out its duties.

The Committee shall be given full access to the Company's internal audit group, Board of Directors, corporate executives, and independent auditor as

necessary to carry out these responsibilities. While acting within the scope of its stated purpose, the Committee shall have all the authority of the Board of Directors, except as otherwise limited by applicable law.

Notwithstanding the foregoing, the Committee is not responsible for certifying the Company's financial statements or guaranteeing the independent auditor's report. The fundamental responsibility for the Company's financial statements and disclosures rests with management and the independent auditor. It also is the job of the Chief Executive Officer and senior management, rather than that of the Committee, to assess and manage the Company's exposure to risk.

*Documents/Reports Review*

1.      Discuss with management and the independent auditor, prior to public dissemination, the Company's annual audited financial statements and quarterly financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and discuss with the independent auditor the matters required to be discussed by Statement of Auditing Standards No. 61 and PCAOB Auditing Standards No. 1301.

2.      Discuss with management and the independent auditor, prior to the Company's filing of any quarterly or annual report, (a) whether any significant deficiencies in the design or operation of internal control over financial reporting exist that could adversely affect the Company's ability to record, process, summarize, and report financial data; (b) the existence of any material weaknesses in the Company's internal control over financial reporting; and (c) the existence of any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

3.      Discuss with management and the independent auditor the Company's earnings press releases (paying particular attention to the use of any "pro forma" or "adjusted" or other non-GAAP information), as well as financial information and earnings guidance provided and the type of presentations made to analysts and rating agencies. The Committee's discussion in this regard may be general in nature (*i.e.*, discussion of the types of information to be disclosed and the type of presentation to be made) and need not take place in advance of each earnings release or each instance in which the Company may provide earnings guidance.

4.      Discuss with management and the independent auditor the Company's major financial risk exposures, the guidelines and policies by which risk assessment and management is undertaken, and the steps management has taken to monitor and control risk exposure.

*        *        *

*Financial Reporting Process*

1.     In consultation with the independent auditor, management, and the internal auditor, review the integrity of the Company's financial reporting processes, both internal and external. In that connection, the Committee should obtain and discuss with management and the independent auditor reports from management and the independent auditor regarding (a) all critical accounting policies and practices to be used by the Company and the related disclosure of those critical accounting policies under "Management's Discussion and Analysis of Financial Condition and Results of Operations"; (b) analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements; (c) all alternative treatments of financial information within generally accepted accounting principles that have been discussed with the Company's management, the ramifications of the use of the alternative disclosures and treatments, and the treatment preferred by the independent auditor; (d) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; (e) major issues as to the adequacy of the Company's internal controls and any specific audit steps adopted in light of material control deficiencies; (f) issues with respect to the design and effectiveness of the Company's disclosure controls and procedures, management's evaluation of those controls and procedures, and any issues relating to such controls and procedures during the most recent reporting period; (g) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company; (h) any significant matters arising from any audit, including any audit problems or difficulties, whether raised by management, the internal auditor, or the independent auditor, relating to the Company's financial statements; and (i) any other material written communications between the independent auditor and the Company's management, including any "management" letter or schedule of unadjusted differences.

2.     Review periodically the effect of regulatory and accounting initiatives, as well as off balance sheet structures, on the financial statements of the Company.

3.     Review with the independent auditor any audit problems or difficulties encountered and management's response thereto. In this regard, the Committee will regularly review with the independent auditor (a) any audit problems or other difficulties encountered by the auditor in the course of the audit work, including any restrictions on the scope of the independent auditor's activities or on access to requested information, and any significant disagreements with management and (b) management's responses to such matters. Without excluding other possibilities, the Committee may review with the independent auditor (i) any accounting adjustments that were noted or proposed by the auditor but were "passed" (as immaterial or otherwise), (ii) any communications between the audit team and the audit firm's national office respecting auditing or accounting issues presented by the engagement, and (iii) any "management" or "internal control" letter issued, or proposed to be issued, by the independent auditor to the Company.

4. Advise management, the internal audit department, and the independent auditor that they are expected to provide the Committee a timely analysis of any significant financial reporting issues and practices.

5. Obtain from the independent auditor assurance that the audit of the Company's financial statements was conducted in a manner consistent with §10A of the Securities Exchange Act of 1934, which sets forth procedures to be followed in any audit of financial statements required under the Securities Exchange Act of 1934.

6. Request the internal auditor to provide the Committee with summaries and, as appropriate, the significant reports to management prepared by the internal auditor and any management responses thereto.

7. Discuss the scope of the annual audit and review the form of the opinion the independent auditor proposes to render.

8. Review and discuss with management and the independent auditor the responsibilities, budget, and staffing of the Company's internal audit function and any appointment or replacement of the internal auditor or the director of the internal auditing department.

*Legal Compliance/General*

1. Review periodically, with the Company's legal counsel, any significant legal, compliance, or regulatory matters that may have a material effect on the Company's financial statements or the Company's business or compliance policies, including material notices to or inquiries received from governmental agencies.

2. Discuss with management and the independent auditor the Company's guidelines and policies with respect to risk assessment and risk management. The Committee will discuss the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

43. In committing the wrongful acts alleged herein, defendants have pursued, or joined in the pursuit of, a common course of conduct and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, defendants further aided and abetted and/or assisted each other in breaching their respective duties.

44.     During all times relevant hereto, defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) conceal harmful information relating to Roadrunner's internal controls and disclosure procedures, as well as the operation of the Company's growth-through-acquisition strategy, which rendered statements in the Company's SEC filings and public announcements improper; (ii) deceive the investing public, including stockholders of Roadrunner, regarding defendants' management of Roadrunner's operations and the adequacy of its internal controls and disclosure procedures; and (iii) enhance defendants' executive and directorial positions at Roadrunner and the profits, power and prestige that defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy and course of conduct, defendants, collectively and individually, took the actions set forth herein.

45.     Defendants engaged in a conspiracy, common enterprise and/or common course of conduct. During this time, defendants caused the Company to issue improper financial statements.

46.     The purpose and effect of defendants' conspiracy, common enterprise and/or common course of conduct was, among other things, to disguise defendants' violation of the securities law, breach of fiduciary duty, waste of corporate assets and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition and future business prospects.

47.     Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements. Because the actions described herein occurred under the authority of the Board, each of the defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

48.     Each of the defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the

wrongdoing complained of herein, each defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

49.     Roadrunner is an asset-light transportation and logistics services provider that offers a suite of global supply chain solutions, including TL, customized and expedited LTL, intermodal solutions, freight consolidation, inventory management, expedited services, air freight, international freight forwarding, customs brokerage, and TMS.  To provide these services, the Company purchases existing providers with pre-existing transportation equipment and facilities in the small to mid-size range, claiming that its business model makes the Company highly scalable and flexible.

50.     According to Roadrunner's initial Registration Statement, filed ahead of the Company's IPO on July 24, 2008, the Company would be pursuing a growth-through-acquisition strategy, stating that it would continue to "develop [as] a full-service transportation and logistics provider under a non-asset based structure through the integration and internal growth of complementary businesses."

**Roadrunner Spends Hundreds of Millions of Dollars**
**Acquiring Companies to Enhance Its Financial Reporting**

51.     Since Roadrunner's formation in June 2005, HCI has been the Company's largest stockholder, currently owning 24.9% of the Company's outstanding common stock.  During the relevant period from 2013 to 2016, various HCI affiliates maintained three seats on Roadrunner's Board, including defendants Evans, Rued and Vijums.  Under defendants' supervision, Roadrunner engaged HCI in several consulting and advisory agreements to assist the Company in its growth-through-acquisition strategy.  During the course of this arrangement, the Company paid HCI $3.5 million in fees and other remuneration.

52.    During the relevant period from 2013 to 2016, Roadrunner actively pursued a corporate growth strategy by acquiring several companies, assisted by HCI and its affiliates. The Company recklessly expanded its credit facility with its lenders in order to finance the Company's purchases. As part of this strategy, Roadrunner purchased Morgan Southern for $20 million and Bruenger for over $10 million in 2011, among several other companies. The Company now has 25 operating businesses under the Roadrunner banner.

53.    While this acquisition-leaning strategy resulted in a heavy debt load and diminished cash flows, Roadrunner outwardly reported revenues increasing from $632 million in 2010 to nearly $2 billion by 2015. But these financial results would prove to be a fabrication.

54.    From at least 2013 through 2016, the Company engaged in a corporate growth strategy, acquiring several additional transportation providers for hundreds of millions of dollars altogether, to artificially enhance the Company's revenues, while downplaying the Company's expenses through accounting manipulations. This reckless corporate strategy ultimately contributed to the failure in the Company's internal accounting controls and control over its financial reporting.

**Improper Statements Regarding Roadrunner's**
**Financial Performance and Internal Controls**

55.    Defendants' improper statements regarding Roadrunner's financial performance began on May 1, 2013, when defendants caused the Company to issue a press release announcing its financial results for the first quarter ended March 31, 2013. In the press release, defendant DiBlasi emphasized the Company's "record revenues and operating income," stating:

> "*We achieved record revenues and operating income in the first quarter of 2013*. These records were achieved in the lowest seasonal quarter of the year and in a quarter with fewer business days than normal. *Strong performance across all of our business segments generated first quarter revenue growth of 26.5% and net revenue growth of 33.8%. Due to sales and operational initiatives, our operating income growth of 30.7% outpaced revenue.* Our operating ratio improved 20 basis points to 93.6%, compared to 93.8% in the first quarter of 2012, despite additional

costs incurred for service initiatives implemented in our LTL segment due to adverse weather conditions. Additional costs incurred in our LTL segment for the weather-related service initiatives negatively impacted our first quarter diluted earnings per share by approximately $0.02.

"Our LTL operating ratio improved sequentially to 93.2% in the first quarter of 2013 from 94.9% in the fourth quarter of 2012. Our continued initiatives to expand into new geographic regions, build density, improve pricing, and enhance productivity, as well as the addition of Expedited Freight Systems (EFS) in August 2012, resulted in a net revenue margin improvement from 25.8% in the first quarter of 2012 to 28.5% in the first quarter of 2013. We are pleased with the first quarter operating ratio, despite experiencing load inefficiencies due to the inclement weather.

"Our continued performance initiatives led to our TL operating ratio improving to 93.4% in the first quarter of 2013 from 94.2% in the first quarter of 2012. TL revenues grew by $48.5 million, or 49.5%, from the prior year quarter. Incremental revenues from our 2012 acquisitions accounted for $42.4 million of the increase, with the remaining $6.1 million representing organic growth of 6.2%. The positive impact of the acquisitions and operating leverage associated with our revenue growth led to a 70.8% increase in our TL operating income quarter-over-quarter.

"*TMS revenue grew $0.8 million, or 3.7%, in the first quarter of 2013 from the prior year quarter. Organic growth, pricing, and our late February 2012 acquisition of Capital Transportation Logistics accounted for the 3.7% increase.* The operating leverage associated with this growth led to a 5.0% increase in TMS operating income quarter-over-quarter. Our TMS operating ratio improved to 89.2% compared to 89.3% in the first quarter of 2012."[3]

56.     On May 10, 2013, defendants caused the Company to file with the SEC its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2013 (the "1Q 2013 Form 10-Q"). Repeating the financial statements in the press release, defendants, in the section entitled "Controls and Procedures," asserted that the Company's disclosure controls and procedures were effective and that there was no change in its internal controls that had materially affected its financial reporting. Defendants DiBlasi and Armbruster signed the 1Q 2013 Form 10-Q, including statements concerning the adequacy of the Company's internal controls over its financial reporting. The public filing contained certifications by defendants DiBlasi and Armbruster pursuant to §§302

---

[3]     Emphasis has been added unless otherwise noted.

and 906 of the Sarbanes-Oxley Act of 2002 ("SOX") that the financial information contained within was accurate and disclosed any material changes to the Company's internal controls over its financial reporting.

57.    On July 25, 2013, defendants caused Roadrunner to announce in a press release that it had acquired all of the outstanding membership interests of Marisol International LLC ("Marisol"), a supply chain provider of international logistics solutions based in Springfield, Missouri. Roadrunner purchased Marisol for $66 million, plus an earn-out capped at $2.5 million. Referring to the Company's on-going growth-through-acquisition strategy, defendant DiBlasi, President and CEO of Roadrunner, stated: "'As we have indicated, one of our key strategic objectives in 2013 is broadening our international capabilities to meet our customers' total transportation and logistics needs.'"

58.    On July 31, 2013, defendants caused Roadrunner to announce in a press release its financial results for the second quarter ended June 30, 2013. The press release boasted of a strong performance across all business segments, with revenue growth of 26.4% and net revenue growth of 35.6%. Due to alleged sales and operational initiatives, the Company asserted operating income growth of 31.4%, which outpaced revenue. The Company also claimed an operating ratio at 92.6%, improving 30 basis points, compared to 92.9% in the second quarter of 2012. The press release, noting the alleged positive impact of the Company's acquisitions, quoted defendant DiBlasi as stating:

> "Our LTL operating ratio remained the same quarter-over-quarter and improved sequentially to 91.9% in the second quarter of 2013 from 93.2% in the first quarter of 2013. Our continued initiatives to expand into new geographic regions, build density, improve pricing, and enhance productivity, as well as the addition of Expedited Freight Systems (EFS) in August 2012, resulted in a net revenue margin improvement from 25.8% in the second quarter of 2012 to 28.8% in the second quarter of 2013.
>
> "Our continued performance initiatives led to our TL operating ratio improving to 93.0% in the second quarter of 2013 from 93.9% in the second quarter

of 2012. TL revenues grew by $50.2 million, or 45.2%, from the prior year quarter. Incremental revenues from our 2012 and 2013 acquisitions accounted for $43.3 million of the increase, with the remaining $6.9 million representing organic growth of 6.2% from our existing business. ***The positive impact of the acquisitions and operating leverage associated with our revenue growth led to a 66.2% increase in our TL operating income quarter-over-quarter.***

    ***"TMS revenue grew $3.8 million, or 16.6%, in the second quarter of 2013 from the prior year quarter, primarily due to our 2013 acquisition of Adrian Carriers***. This growth, along with a $0.7 million contingent purchase price adjustment, led to a 43.4% increase in TMS operating income quarter-over-quarter."

    59.    On August 9, 2013, defendants caused the Company to file with the SEC its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2013 (the "2Q 2013 Form 10-Q"). Repeating the financial statements in the press release, defendants, in the section entitled "Controls and Procedures," asserted that the Company's disclosure controls and procedures were effective and that there was no change in its internal controls that had materially affected its financial reporting. Defendants DiBlasi and Armbruster signed the 2Q 2013 Form 10-Q, including statements concerning the adequacy of the Company's internal controls over its financial reporting. The public filings contained SOX certifications by defendants DiBlasi and Armbruster that the financial information contained within was accurate and disclosed any material changes to the Company's internal controls over its financial reporting.

    60.    On August 15, 2013, defendants caused Roadrunner to announce in a news release that it had acquired certain assets from the Southeast drayage division of Transport Corporation of America, Inc. ("TA Drayage"), a provider of intermodal transportation and related services in the southeast United States, for approximately $1.2 million, which was financed with Roadrunner's cash on hand. The news release added that during calendar year 2012, TA Drayage generated approximately $20 million in revenues and that the acquisition of TA Drayage was expected to increase Roadrunner's earnings in 2013.

    61.    On September 18, 2013, defendants caused Roadrunner to announce in a press release that it had acquired substantially all of the assets of YES Trans, Inc. ("YES"), a refrigerated

truckload service provider based in Salisbury, Massachusetts, for approximately $1.2 million, net of cash acquired, plus an earn-out capped at $1.1 million, financed with Roadrunner's cash on hand. The press release stated that during calendar year 2012, YES generated approximately $5 million in revenues and that YES was expected to increase Roadrunner's earnings in the near term.

62.     On October 30, 2013, defendants caused Roadrunner to announce in a press release its financial results for the third quarter ended September 30, 2013. The Company reported revenue growth, with operating income growth outpacing revenue growth, which it attributed to acquisitions.  The press release quoted defendant DiBlasi:

> *"The combination of strong organic and acquisition-related revenue growth led to a 30.1% increase in third quarter revenues and a 32.3% increase in net revenues over the third quarter of 2012.  For the 2013 third quarter, our operating income growth of 31.4% continued to outpace our revenue growth*.  Our operating ratio improved 10 basis points to 93.5% from 93.6% in the third quarter of 2012.

> *"LTL revenues grew by $11.7 million, or 8.9%, from the prior year third quarter.  Incremental revenues from our 2012 acquisition accounted for $3.1 million of the increase, with the remaining $8.6 million representing organic growth of 6.5%*.  Our organic growth during this year's third quarter was impacted by sluggish economic conditions in which many customers experienced a decline in shipments compared to last year's quarter.  Our LTL operating ratio remained the same quarter-over-quarter at 92.4%.   During the quarter, our LTL segment experienced $1.8 million of additional sequential costs related to an abnormal increase of insurance costs, temporary costs incurred to assist our recently opened service centers, and increased employee costs due to one more payroll day.  The $1.8 million of increased costs were partially offset by a $1.7 million contingent purchase price adjustment.  The addition of Expedited Freight Systems (EFS) in August 2012 and the implementation of certain performance initiatives resulted in a net revenue margin improvement from 27.7% in the third quarter of 2012 to 28.5% in the third quarter of 2013.

> *"TL revenues grew by $45.9 million, or 36.9%, from the prior year third quarter.  Incremental revenues from our 2012 and 2013 acquisitions accounted for $32.3 million of the increase, with the remaining $13.6 million representing organic growth of 11.0% from our existing business*.  Our TL operating ratio improved to 93.6% in the third quarter of 2013 from 94.1% in the third quarter of 2012.  TL revenues and operating costs in this year's third quarter were also negatively affected by sluggish economic conditions, increased costs associated with hours of service rules and a flat pricing environment.  During the quarter, our TL segment also experienced $1.3 million of additional sequential costs related to an abnormal increase in insurance costs, lost productivity in drayage and warehousing

due to port strikes and customer order system changes, and increased employee costs due to one more payroll day. Offsetting these increased costs was a $1.6 million contingent purchase price adjustment related to two acquisitions, whose revised forecasted performance yields lower future earn-out payments. *The positive impact of the acquisitions and operating leverage associated with our revenue growth led to a 48.1% increase in our TL operating income quarter-over-quarter.*

"*TMS revenue grew $27.0 million, or 112.6%, in the third quarter of 2013 from the prior year quarter, primarily due to our 2013 acquisitions of Adrian Carriers and Marisol International. This growth led to a 68.8% increase in TMS operating income quarter-over-quarter.*"

63. On November 8, 2013, defendants caused the Company to file with the SEC its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2013 (the "3Q 2013 Form 10-Q"). Repeating the financial statements in the press release, defendants, in the section entitled "Controls and Procedures," asserted that the Company's disclosure controls and procedures were effective and that there was no change in its internal controls that had materially affected its financial reporting. Defendants DiBlasi and Armbruster signed the 3Q 2013 Form 10-Q, including statements concerning the adequacy of the Company's internal controls over its financial reporting. The public filing contained SOX certifications by defendants DiBlasi and Armbruster that the financial information contained within was accurate and disclosed any material changes to the Company's internal controls over its financial reporting.

64. In a February 5, 2014 press release, Roadrunner reported financial results for the fourth quarter and fiscal year ended December 31, 2013. The Company attributed its increased growth to its acquisition strategy. The press release quoted defendant DiBlasi:

"*Although strong organic and acquisition-related revenue growth led to a 24.4% increase in 2013 fourth quarter revenues and a 21.6% increase in 2013 fourth quarter net revenues over the fourth quarter of 2012,* our lower than expected diluted income per share in the fourth quarter of 2013 resulted primarily from the following major factors that affected all of our segments. . . . Final valuations of definite-lived intangible assets related to our 2013 acquisitions of Marisol International and Adrian Carriers increased amortization expense by approximately $0.5 million, which negatively impacted our 2013 fourth quarter diluted income per share by $0.01. . . . During the fourth quarter of 2013, the above noted factors were partially offset by net contingent earnout adjustments of $2.6 million related to prior acquisitions and a reduction in our effective tax rate from

38.8% for the fourth quarter of 2012 to 29.2% for the fourth quarter 2013 due to a permanent tax benefit related to contingent earnout adjustments.

*"LTL revenues grew by $5.7 million, or 4.4%, during the fourth quarter of 2013 from the prior year fourth quarter. Our LTL revenue growth over the prior year quarter was almost entirely attributable to our recently opened terminals. . .*

*"TL revenues grew by $36.7 million, or 25.6%, during the fourth quarter of 2013 from the prior year fourth quarter. Incremental revenues from our 2013 acquisitions accounted for $23.1 million of the increase, with the remaining $13.7 million representing 9.5% organic growth. . . . However, the positive impact of our recent TL acquisitions and organic revenue growth led to a 12.3% increase in TL operating income quarter-over-quarter.*

*"TMS revenue grew by $30.9 million, or 130.0% during the fourth quarter of 2013 from the prior year fourth quarter, primarily as a result of our 2013 TMS acquisitions of Adrian Carriers and Marisol International.* This growth led to a 35.9% increase in TMS operating income quarter-over-quarter. Final valuations of definite-lived intangible assets related to our acquisitions of Marisol International and Adrian Carriers resulted in increased amortization expense of approximately $0.5 million sequentially from the third quarter 2013 to the fourth quarter 2013.

*"Our consolidated revenue increased 26.8% to $1,361.4 million in fiscal 2013 from $1,073.4 million in fiscal 2012. This revenue growth was a combination of both organic- and acquisition related growth.* Our consolidated operating income increased 23.8% to $85.4 million in fiscal 2013 from $69.0 million in fiscal 2012. Our consolidated net income available to common stockholders increased 30.6% to $49.0 million in fiscal 2013 from $37.5 million in fiscal 2012. Our diluted income per share available to common stockholders increased 11.2% to $1.29 in fiscal 2013 from $1.16 in fiscal 2012. Our December 2012 and August 2013 stock offerings increased the weighted average diluted shares outstanding for the year ended December 31, 2013 by 4.3 million shares and impacted diluted income per share by $0.16 from the prior year."

65.     On February 24, 2014, Roadrunner announced in a press release the acquisition of Rich Logistics, a provider of truckload and expedited services based in Little Rock, Arkansas. Additionally, Roadrunner announced the acquisition of Everett Transportation Inc. and certain assets of Keith Everett ("Everett"). Everett is a contractor operating exclusively for Rich Logistics. The total enterprise value of the transaction was approximately $48 million. The acquisition was financed with borrowings under Roadrunner's credit facility. According to the press release, Rich

Logistics generated revenues of approximately $113 million in 2013 and was expected to increase Roadrunner's earnings in 2014.

66.    On March 13, 2014, defendants caused the Company to file with the SEC its Annual Report on Form 10-K for the fourth quarter and fiscal year ended December 31, 2013 (the "2013 Form 10-K"). The 2013 Form 10-K repeated the financial statements in the previous press release. Moreover, in the section entitled "Controls and Procedures – Management's Report on Internal Control Over Financial Reporting," defendants declared that management is "responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) to provide reasonable assurance regarding the reliability of our financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles." Defendants, despite this responsibility, claimed no change in the Company's internal controls over financial reporting.    Defendants DiBlasi, Armbruster, Rued, Doerr, Evans, Kennedy, Staley, Urkiel, Utrup and Vijums signed the Form 10-K, including statements concerning the adequacy of the Company's internal controls over its financial reporting.

67.    The 2013 Form 10-K contained signed SOX certifications by defendants DiBlasi and Armbruster representing that the financial information contained in the 2013 Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting. The certifications stated, in relevant part as follows:

I, Mark A. DiBlasi, certify that:

1.    I have reviewed this Quarterly Report on Form 10-Q of Roadrunner Transportation Systems, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15 (f)) for the registrant and have:

   a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 12, 2014                                    /s/ Mark A. DiBlasi

\*     \*     \*

I, Peter R. Armbruster, certify that:

1.      I have reviewed this Quarterly Report on Form 10-Q of Roadrunner Transportation Systems, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15 (f)) for the registrant and have:

      a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

      b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

      c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

      d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

32

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

       a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

       b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 12, 2014
                                                /s/ Peter R. Armbruster
                                                Peter R. Armbruster
                    Vice President – Finance, Chief Financial Officer,
                                        Treasurer, and Secretary

68.     On March 14, 2014, Roadrunner announced in a press release that it had acquired all of the outstanding stock of Unitrans International Corporation ("Unitrans"), an international logistics solutions provider based in Los Angeles, California, for a total purchase price of $55.5 million, financed by borrowings under Roadrunner's credit facility. The press release stated that Unitrans generated revenues of approximately $84 million in 2013, and that Unitrans was expected to increase Roadrunner's earnings in 2014.

69.     On May 8, 2014, defendants caused Roadrunner to with the SEC file its Quarterly Report on Form 10-Q announcing the Company's financial and operating results for the first quarter ended March 31, 2014 (the "1Q 2014 Form 10-Q"). For the quarter, defendants claimed that the Company had net income of $10.4 million, or $0.27 per diluted share, on revenue of $382 million, compared to net income of $10.6 million, or $0.29 per diluted share, on revenue of $299.3 million for the same period in the prior year. Defendants also reported a $22.7 million increase in accounts receivable and a $2.2 million decrease in accounts payable. Furthermore, in the section entitled "Controls and Procedures," defendants asserted that the Company's disclosure controls and procedures were effective and there was no change in its internal controls that had materially

affected its financial reporting. Defendants DiBlasi and Armbruster signed the 1Q 2014 Form 10-Q, including statements concerning the adequacy of the Company's internal controls over its financial reporting. The public filing contained SOX certifications by defendants DiBlasi and Armbruster that the financial information contained within was accurate and disclosed any material changes to the Company's internal controls over its financial reporting.

70. On July 9, 2014, Roadrunner announced in a press release that it had expanded the Company's existing credit facility to $550 million from $368 million through 2019. Roadrunner's CEO, defendant DiBlasi, stated that "'[t]he amendment reflects the Company's strong capital position and financial flexibility, providing an ongoing ability to drive growth organically and through strategic acquisitions.'"

71. On July 21, 2014, Roadrunner announced in a press release the Company's acquisition of Integrated Services, ISI Logistics and ISI Logistics South ("Integrated Services"), a regional logistics provider focused on the warehousing and transportation needs of customers based in Kokomo, Indiana. The total purchase price was $13 million and was financed with borrowings under Roadrunner's credit facility. The press release further stated that Integrated Services generated revenues of approximately $21 million in 2013, and that Integrated Services was expected to increase Roadrunner's earnings in 2014.

72. On August 7, 2014, defendants caused Roadrunner to file with the SEC its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2014 (the "2Q 2014 Form 10-Q"). Without revealing on-going issues with the Company's internal controls over its financial reporting, defendants claimed that net income was $14.8 million, or $0.38 per diluted share, on revenue of $460.2 million, compared to net income of approximately $14 million, or $0.37 per diluted share, on revenue of $331.9 million for the same period in the prior year. Defendants also reported a $36.8 million increase in accounts receivable and a $0.9 million increase in accounts payable.

Defendants, in the section entitled "Controls and Procedures," repeated the assertion that the Company's disclosure controls and procedures were effective and there was no change in its internal controls that had materially affected its financial reporting. Defendants DiBlasi and Armbruster signed the 2Q 2014 Form 10-Q, including statements concerning the adequacy of the Company's internal controls over its financial reporting. The public filing contained SOX certifications by defendants DiBlasi and Armbruster that the financial information contained within was accurate and disclosed any material changes to the Company's internal controls over its financial reporting.

73. On November 6, 2014, defendants caused Roadrunner to file with the SEC its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2014 (the "3Q 2014 Form 10-Q"). For the quarter, defendants reported that net income was $14.4 million, or $0.37 per diluted share, on revenue of $498.1 million, compared to net income of $13.2 million, or $0.35 per diluted share, on revenue of $363.2 million for the same period in the prior year. Defendants also reported a $55.3 million increase in accounts receivable and a $19.4 million increase in accounts payable. Without mentioning possible on-going accounting issues, in the section entitled "Controls and Procedures," defendants repeated the assertion that the Company's disclosure controls and procedures were effective and there was no change in its internal controls that had materially affected its financial reporting. Defendants DiBlasi and Armbruster signed the 3Q 2014 Form 10-Q, including statements concerning the adequacy of the Company's internal controls over its financial reporting. The public filing contained SOX certifications by defendants DiBlasi and Armbruster that the financial information contained within was accurate and disclosed any material changes to the Company's internal controls over its financial reporting.

74. On March 2, 2015, defendants caused Roadrunner to file with the SEC its Annual Report on Form 10-K announcing the Company's financial and operating results for the fourth

quarter and fiscal year ended December 31, 2014 (the "2014 Form 10-K"). For the quarter, defendants reported net income of $12.3 million, or $0.32 per diluted share, on revenue of $532.5 million, compared to net income of $11.2 million, or $0.29 per diluted share, on revenue of approximately $367 million for the same period in the prior year. Additionally, for 2014, defendants reported net income of $52 million, or $1.32 per diluted share, on revenue of $1.9 billion, compared to net income of $49 million, or $1.29 per diluted share, on revenue of $1.3 billion for 2013. Defendants also alleged that there was a $44.5 million increase in accounts receivable and a $10.9 million increase in accounts payable for 2014. In the section entitled "Controls and Procedures – Evaluation of Disclosure Controls and Procedures," defendants reiterated that the Company's disclosure controls and procedures were effective. Moreover, in the section entitled "Controls and Procedures – Management's Report on Internal Control Over Financial Reporting," defendants declared that management is "responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) to provide reasonable assurance regarding the reliability of our financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles." Defendants, despite this responsibility, claimed that there was no material change in the Company's internal controls over financial reporting. Defendants DiBlasi, Armbruster, Rued, Doerr, Kennedy, Staley, Urkiel, Utrup and Vijums signed the Form 10-K, including statements concerning the adequacy of the Company's internal controls over its financial reporting.

75. The 2014 Form 10-K contained signed SOX certifications by defendants DiBlasi and Armbruster representing that the financial information contained in the 2014 Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting. The certifications stated, in relevant part as follows:

I, Mark A. DiBlasi, certify that:

1.    I have reviewed this Annual Report on Form 10-K of Roadrunner Transportation Systems, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15 (f)) for the registrant and have:

    a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:   March 2, 2015                                      /s/ Mark A. DiBlasi
                                                                Mark A. DiBlasi
                                         President and Chief Executive Officer

                    *          *          *

I, Peter R. Armbruster, certify that:

1.      I have reviewed this Annual Report on Form 10-K of Roadrunner Transportation Systems, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15 (f)) for the registrant and have:

a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared; .

b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the

effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 2, 2015

/s/ Peter R. Armbruster
Peter R. Armbruster
Vice President – Finance, Chief Financial Officer,
Treasurer, and Secretary

76. On April 7, 2015, defendants DiBlasi, Doerr, Kennedy, Rued, Staley, Urkiel, Utrup and Vijums caused Roadrunner to file with the SEC its 2015 Proxy Statement on Form DEF 14A (the "2015 Proxy"). Those defendants stated in the 2015 Proxy that the Board was committed to risk oversight, the Audit Committee exercised oversight of the Company's financial statements, and Roadrunner's financial statements were accurate and therefore the Board's approval of their inclusion in the Company's annual report was appropriate. The 2015 Proxy also included a vote on the election of members of the Board, including defendants Urkiel, Utrup and Vijums.

77. On May 7, 2015, defendants caused Roadrunner to file with the SEC its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2015 (the "1Q 2015 Form 10-Q"). For the quarter, despite on-going accounting issues, defendants reported net income of $13.6 million, or $0.35 per diluted share, on revenue of approximately $489 million, compared to net income of

$10.4 million, or $0.27 per diluted share, on revenue of $382 million for the same period in the prior year. Defendants also reported a $3.9 million increase in accounts receivable and an $11.3 million increase in accounts payable. Defendants, in the section entitled "Controls and Procedures," repeated the assertion that the Company's disclosure controls and procedures were effective and there was no change in its internal controls that had materially affected its financial reporting. Defendants DiBlasi and Armbruster signed the 1Q 2015 Form 10-Q, including statements concerning the adequacy of the Company's internal controls over its financial reporting. The public filing contained SOX certifications by defendants DiBlasi and Armbruster that the financial information contained within was accurate and disclosed any material changes to the Company's internal controls over its financial reporting.

78.     On July 28, 2015, Roadrunner announced in a press release that it had acquired Stagecoach Cartage and Distribution, a provider of truckload and logistics services based in El Paso, Texas, for a total purchase price of $35 million, plus an earn-out capped at $5 million. In the press release, defendant DiBlasi claimed that the acquisition "'provides us with immediately realizable growth opportunities created by the accelerating demand within the region.'"

79.     On August 3, 2015, defendants caused Roadrunner to file with the SEC its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2015 (the "2Q 2015 Form 10-Q"). Defendants reported net income of $16.5 million, or $0.42 per diluted share, on revenue of $517.9 million, compared to net income of $14.8 million, or $0.38 per diluted share, on revenue of $460.2 million for the same period in the prior year, despite continued accounting issues. Defendants also reported a $28 million increase in accounts receivable and a $5.5 million increase in accounts payable. Defendants, in the section entitled "Controls and Procedures," repeated the assertion that the Company's disclosure controls and procedures were effective and there was no change in its internal controls that had materially affected its financial reporting. Defendants DiBlasi and

Armbruster signed the 2Q 2015 Form 10-Q, including statements concerning the adequacy of the Company's internal controls over its financial reporting. The public filing contained SOX certifications by defendants DiBlasi and Armbruster that the financial information contained within was accurate and disclosed any material changes to the Company's internal controls over its financial reporting.

80.     On September 28, 2015, Roadrunner announced in a press release that on September 24, 2015, the Company had expanded its existing credit facility to $700 million from $550 million through 2019. Defendant DiBlasi stated that "'[t]he amendment reflects the Company's strong capital position and financial flexibility, providing an ongoing ability to drive growth organically and through strategic acquisitions.'"

81.     In fiscal year 2015, Roadrunner's issues with its debt load and the Company's ability to meet the maximum cash flow leverage ratio set by the covenants with the Company's lenders became more apparent. The covenants with the Company's lenders set strict limits for the ratio of Roadrunner's total funded debt to its earnings before interest, tax, depreciation and amortization ("EBITDA"), referred to as the maximum cash flow leverage ratio. Particularly, during a November 5, 2015 earnings call about the Company's third fiscal quarter of 2015, defendant Armbruster acknowledged that with net debt load so high, at $449 million, the Company's current cash flow leverage ratio was 3.75, with "about a quarter rooms [sic] on that." This ratio was dangerously close to the limits set by the lenders' covenants.

82.     On November 9, 2015, defendants caused Roadrunner to file with the SEC its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2015 (the "3Q 2015 Form 10-Q"). For the quarter, defendants reported net income of $5.8 million, or $0.15 per diluted share, on revenue of $497.2 million, compared to net income of $14.4 million, or $0.37 per diluted share, on revenue of $498.1 million for the same period in the prior year. Defendants also reported a $3.3

million increase in accounts receivable and a $9.9 million decrease in accounts payable. Defendants, in the section entitled "Controls and Procedures," reiterated the assertion that the Company's disclosure controls and procedures were effective and there was no change in its internal controls that had materially affected its financial reporting. Defendants DiBlasi and Armbruster signed the 1Q 2015 Form 10-Q, including statements concerning the adequacy of the Company's internal controls over its financial reporting. The public filing contained SOX certifications by defendants DiBlasi and Armbruster that the financial information contained within was accurate and disclosed any material changes to the Company's internal controls over its financial reporting.

83.     Roadrunner's issue with its burdensome debt load and decreasing cash flows due to its tenuous acquisition strategy continued into 2016. During a February 3, 2016 earnings call discussing the Company's 2015 fourth quarter, defendant Armbruster stated that issues with the Company's cash flow leverage ratio had shifting corporate focus. Defendant Armbruster acknowledged during the call that, "[w]hile our focus over the past several years has been on strategic growth and acquisition initiatives to position us for the long term, our focus in 2016 will be on enhancing cash flow from operations and reducing our leverage ratio towards our long-term goal of less than 2.5 times EBITDA."

84.     On March 1, 2016, defendants caused Roadrunner to file with the SEC its Annual Report on Form 10-K, announcing the Company's financial and operating results for the fourth quarter and fiscal year ended December 31, 2015 (the "2015 Form 10-K"). Omitting on-going accounting issues, for the quarter, defendants reported net income of $12.1 million, or $0.32 per diluted share, on revenue of $491 million, compared to net income of $12.4 million, or $0.32 per diluted share, on revenue of $532.5 million for the same period in the prior year. For 2015, defendants reported that net income was $48 million, or $1.23 per diluted share, on revenue of $2

billion, compared to net income of $52 million, or $1.32 per diluted share, on revenue of $1.9 billion for 2014. Defendants also reported a $14 million decrease in accounts receivable and a $15.7 million decrease in accounts payable for 2015. Moreover, in the section entitled "Controls and Procedures – Management's Report on Internal Control Over Financial Reporting," defendants declared that management is "responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) to provide reasonable assurance regarding the reliability of our financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles." Defendants, despite this responsibility, claimed no change in the Company's internal controls over financial reporting. Defendants DiBlasi, Stoelting, Armbruster, Rued, Doerr, Kennedy, Staley, Urkiel, Murray, Vijums and Ward signed the Form 10-K, including statements concerning the adequacy of the Company's internal controls over its financial reporting. The 2015 Form 10-K contained signed SOX certifications by defendants DiBlasi and Armbruster representing that the financial information contained in the 2015 Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting. The certifications stated, in relevant part as follows:

I, Mark A. DiBlasi, certify that:

1.      I have reviewed this Annual Report on Form 10-K of Roadrunner Transportation Systems, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in

Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15 (f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 29, 2016                                    /s/ Mark A. DiBlasi
                                                               Mark A. DiBlasi
                                              President and Chief Executive Officer

\*          \*          \*

I, Peter R. Armbruster, certify that:

1.    I have reviewed this Annual Report on Form 10-K of Roadrunner Transportation Systems, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15 (f)) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 29, 2016                                    /s/ Peter R. Armbruster
                                                          Peter R. Armbruster
                                    Chief Financial Officer, Treasurer, and Secretary

85.    On April 6, 2016, defendants DiBlasi, Stoelting, Doerr, Kennedy, Murray, Rued, Staley, Urkiel, Vijums and Ward caused Roadrunner to file with the SEC its 2016 Proxy Statement on Form DEF 14A (the "2016 Proxy"). Those members of the Board stated in the 2016 Proxy that they were committed to risk oversight, the Audit Committee exercised oversight of the Company's financial statements, and Roadrunner's financial statements were accurate and therefore the Board's approval of their inclusion in the Company's annual report was appropriate. The 2016 Proxy also included a vote on the election of members of the Board, including defendants DiBlasi, Rued and Kennedy.

86.    On May 10, 2016, defendants caused Roadrunner to file with the SEC its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2016 (the "1Q 2016 Form 10-Q"). For the quarter, defendants reported net income of $3.1 million, or $0.08 per diluted share, on revenue of $465.6 million, compared to net income of $13.6 million, or $0.35 per diluted share, on revenue of $489 million for the same period in the prior year. Defendants also reported a $3.4 million decrease in accounts receivable and a $7 million increase in accounts payable. The Company disclosed that there was "a risk that we may not be in compliance with our financial covenants as of the end of the second quarter." Despite this, defendants, in the section entitled "Controls and Procedures," reiterated the assertion that the Company's disclosure controls and procedures were effective and there was no change in its internal controls that had materially affected its financial reporting. Defendants DiBlasi and Armbruster signed the 1Q 2016 Form 10-Q, including statements concerning the adequacy of the Company's internal controls over its financial reporting. The public filing contained SOX certifications by defendants DiBlasi and Armbruster that the

financial information contained within was accurate and disclosed any material changes to the Company's internal controls over its financial reporting.

87. On June 2, 2016, the SEC sent a letter to Roadrunner inquiring into the Company's operating metrics, interim goodwill impairment analysis, and compliance with its financial covenants. In response, Roadrunner's CFO, defendant Armbruster, on behalf of the Company, stated that the Company had met with its primary lending group to amend the credit agreement, including modifications to the specified fixed charge coverage ratio and cash flow leverage ratio for the quarters ended June 30, 2016, September 30, 2016, December 31, 2016, March 31, 2017 and June 30, 2017.

88. On June 23, 2016, in a Current Report on Form 8-K filed with the SEC, Roadrunner stated that on June 17, 2016, the Company had entered into a consent, waiver and first amendment to its credit agreement, increasing the maximum cash flow leverage ratio.

89. During a July 27, 2016 earnings call with analysts and investors, the need for a credit agreement amendment became apparent. Even with the increased maximum cash flow leverage ratio of 4.5 set by the agreement, defendant Armbruster revealed that the Company's cash flow leverage ratio at the end of the second quarter of 2016 was 4.3.

90. On August 8, 2016, defendants caused Roadrunner to file with the SEC its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2016 (the "2Q 2016 Form 10-Q"). Without mentioning any on-going accounting issues, defendants reported that net income was $1.8 million, or $0.05 per diluted share, on revenue of $483.43 million, compared to net income of $16.5 million, or $0.42 per diluted share, on revenue of $517.9 million for the same period in the prior year. Defendants also reported a $2.4 million increase in accounts receivable and a $14.5 million increase in accounts payable. Defendants, in the section entitled "Controls and Procedures," reiterated the assertion that the Company's disclosure controls and procedures were effective and

there was no change in its internal controls that had materially affected its financial reporting. Defendants DiBlasi and Armbruster signed the 2Q 2016 Form 10-Q, including statements concerning the adequacy of the Company's internal controls over its financial reporting. The public filing contained SOX certifications by defendants DiBlasi and Armbruster that the financial information contained within was accurate and disclosed any material changes to the Company's internal controls over its financial reporting.

91.     On November 2, 2016, the Company held an earnings call with analysts and investors. Without revealing the full extent of the Company's accounting issues, defendant Armbruster stated that the Company's cash flow leverage ratio was approximately 3.99, "which is at the maximum currently allowed by our bank credit facility."

**Roadrunner Reveals an Accounting Error in**
**Its Cash Flow Leverage Ratio Calculation**

92.     Then, on November 10, 2016, defendants caused Roadrunner to file with the SEC a Notification of Late Filing on Form 12b-25. Revealing a significant accounting error that prevented filing its Form 10-Q for the third quarter ended September 30, 2016, the Company had identified mistakes in its calculation of its cash flow leverage ratio for an entire fiscal year. The Form 12b-25 stated:

**PART III**
**NARRATIVE**

State below in reasonable detail why Forms 10-K, 20-F, 11-K, 10-Q, 10-D, N-SAR, N-CSR, or the transition report or portion thereof, could not be filed within the prescribed time period.

> *Roadrunner Transportation Systems, Inc. (the "Company") has determined that it is unable to file its Quarterly Report on Form 10-Q for the fiscal quarter ended September 30, 2016 (the "Q3 2016 Form 10-Q")* within the prescribed time period without unreasonable effort or expense for the reasons described below.

> On November 4, 2016, during the preparation and review of the Company's quarterly compliance certificate required under its credit agreement, *the Company identified a mistake in the calculation of its cash*

flow leverage ratio for the four quarters ended September 30, 2016. **Based on the corrected calculation**, upon the delivery of the quarterly compliance certificate (required to be delivered by November 14, 2016), **the Company would not be in compliance with its cash flow leverage ratio financial covenant for the four quarters ended September 30, 2016 absent a waiver of such anticipated non-compliance by the required lenders under the credit agreement**. Since discovering the mistake, the Company has been in ongoing discussions with U.S. Bank National Association ("U.S. Bank") and the other lenders under its credit agreement with respect to a waiver of the Company's anticipated non-compliance with, and any actual or potential event of default resulting from such anticipated non-compliance with, the cash flow leverage ratio financial covenant for the four quarters ended September 30, 2016. As a result of those ongoing discussions and other related matters that have required the attention of senior management and other key personnel, the Company could not, without unreasonable effort and expense, complete its financial statements for the three and nine months ended September 30, 2016 and related disclosures and, consequently, could not file its Q3 2016 Form 10-Q within the prescribed time period. The Company currently intends to file the Q3 2016 Form 10-Q within 5 calendar days of its prescribed due date.

93.     Despite on-going red flags indicating accounting issues and a lack of internal controls over the Company's financial reporting, on November 14, 2016, defendants caused Roadrunner to file with the SEC its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2016 (the "3Q 2016 Form 10-Q"). For the quarter, defendants reported net income of $7.9 million, or $0.21 per diluted share, on revenue of $532.2 million, compared to net income of $5.8 million, or $0.15 per diluted share, on revenue of $497.2 million for the same period in the prior year. Defendants also reported a $39.6 million increase in accounts receivable and a $48.3 million increase in accounts payable. In the section entitled "Liquidity and Capital Resources," the Company stated that it was "probable that we will not be in compliance with our cash flow leverage ratio as of December 31, 2016." Despite this admission, in the section entitled "Controls and Procedures," defendants maintained that the Company's disclosure controls and procedures were effective and there was no change in its internal controls that had materially affected its financial reporting. Defendants DiBlasi and Armbruster signed the 3Q 2016 Form 10-Q, including statements concerning the adequacy of the Company's internal controls over its financial reporting.

The public filing contained SOX certifications by defendants DiBlasi and Armbruster that the financial information contained within was accurate and disclosed any material changes to the Company's internal controls over its financial reporting.

**The False and Misleading 2015 Proxy**

94.    On April 7, 2015, defendants DiBlasi, Doerr, Kennedy, Rued, Staley, Urkiel, Utrup and Vijums caused Roadrunner to file with the SEC its 2015 Proxy in connection with the 2015 Annual Meeting of Stockholders, to be held on May 13, 2015. In the 2015 Proxy, defendants solicited stockholder votes to, among other things, re-elect defendants Urkiel, Utrup and Vijums to the Board. Defendants negligently issued materially misleading statements with respect to these solicited votes. Plaintiff disclaims any claim of fraud or knowing wrongdoing in connection with the misleading statements in the 2015 Proxy.

95.    In support of re-electing defendants Urkiel, Utrup and Vijums, the 2015 Proxy claimed that: (i) the Board was engaged in active risk oversight of the Company, including focusing on the risk in the Company's operations and finances; (ii) the Audit Committee exercised oversight of the Company's financial statements; and (iii) Roadrunner's financial statements were accurate, and therefore the Board's approval of their inclusion in the Company's annual report was appropriate. The 2015 Proxy stated:

> **Role of the Board of Directors in Risk Management and Oversight**
>
> While our management is primarily responsible for managing risk, ***our board of directors and each of its committees plays a role in overseeing our risk management practices. The role of our board of directors in our company's risk oversight process includes receiving reports from members of senior management on areas of material risk to our company, including operational, financial, legal and regulatory, and strategic and reputational risks. Our board of directors receives these reports from the appropriate executive within our organization to enable it to understand our risk identification, risk management, and risk mitigation strategies.*** This direct communication from management enables our board of directors to coordinate its risk oversight role, particularly with respect to risk interrelationships within our organization. Our board of directors believes that its leadership structure has the effect of enhancing its risk oversight function because of the chairman's direct involvement in risk oversight matters and his strong efforts

to increase open communication regarding risk issues among directors and the committees of our board of directors. Our board of directors also believes that Mr. Rued's knowledge of our company's business, industry, and risks significantly contributes to our board of directors' understanding and appreciation of risk issues.

Our board of directors allocates responsibility for overseeing risk management for our company among the board and each of its committees. Specifically, the full board oversees significant risks primarily relating to operations, strategy, and finance. In addition, each of our committees considers risks within its area of responsibilities, as follows:

- *Our audit committee is primarily responsible for overseeing matters involving major financial risk exposures and actions management is taking to monitor such risk exposures. This includes risks relating to financial reporting and internal controls; litigation; tax matters; liability insurance programs; and compliance with legal and regulatory requirements and our code of ethics. In addition, our audit committee reviews our quarterly and annual financial reports, including any disclosure in those reports of risk factors affecting our company and business.*

\* \* \*

Through the activities of our audit, compensation, and nominating/corporate governance committees, as well as our board of directors' interactions with management concerning our business and the material risks that may impact our company, our board of directors is able to monitor our risk management process and offer critical insights to our management.

\* \* \*

## REPORT OF THE AUDIT COMMITTEE OF THE BOARD OF DIRECTORS

Our board of directors has appointed an audit committee consisting of three independent directors. All members of our audit committee are able to read and understand fundamental financial statements, including our balance sheet, income statement, and cash flow statement. All members of our audit committee have past employment experience in finance or accounting, requisite professional certification in accounting, or other comparable experience or background which results in each individual's financial sophistication, including being or having been a chief executive officer, chief financial officer, or other senior officer with financial oversight responsibility. Our board of directors has determined that Messrs. Utrup, Kennedy, and Urkiel are independent directors, as defined by Section 303A of the NYSE Listed Company Manual, and that Mr. Utrup, chairman, qualifies as an "audit committee financial expert."

*The primary responsibility of our audit committee is to assist our board of directors in fulfilling its responsibility to oversee management's conduct of our*

*financial reporting process, including overseeing the financial reports and other financial information provided by us to governmental or regulatory bodies (such as the SEC), the public, and other users thereof; our systems of internal accounting and financial controls; and the annual independent audit of our consolidated financial statements.*

*Management has the responsibility for our consolidated financial statements and the reporting process, including the systems of internal controls.* Our independent registered public accounting firm engaged to conduct the audit of our 2014 financial statements, Deloitte & Touche LLP, is responsible for auditing our consolidated financial statements and expressing an opinion on the conformity of those audited consolidated financial statements with generally accepted accounting principles.

*In fulfilling its oversight responsibilities, our audit committee reviewed and discussed our consolidated audited financial statements with management and the independent registered public accounting firm.* Our audit committee discussed with the independent registered public accounting firm the matters required to be discussed by the Statement on Auditing Standards No. 16, Communication with Audit Committees. *This included a discussion of the independent registered public accounting firm's judgments as to the quality, not just the acceptability, of our accounting principles and such other matters as are required to be discussed with our audit committee under generally accepted auditing standards.* In addition, our audit committee received from the independent registered public accounting firm written disclosures and the letter required by applicable requirements of the Public Company Accounting Oversight Board regarding the independent registered public accounting firm's independence. Our audit committee also discussed with the independent registered public accounting firm their independence from management and our company, including the matters covered by the written disclosures and letter provided by the independent registered public accounting firm. Our audit committee has concluded that Deloitte & Touche LLP is independent from our company and management.

Our audit committee discussed with the independent registered public accounting firm the overall scope and plans for their audits. Our audit committee met with the independent registered public accounting firm, with and without management present, to discuss the results of their examinations, their evaluations of our company, the internal controls, and the overall quality of our financial reporting. Our audit committee held nine meetings during the fiscal year ended December 31, 2014.

*Based on the reviews and discussions referred to above, our audit committee recommended to our board of directors, and our board of directors approved, that our audited consolidated financial statements be included in the Annual Report on Form 10-K for the year ended December 31, 2014 for filing with the SEC.*

Our board of directors has adopted a written charter for our audit committee that reflects, among other things, requirements of the Sarbanes-Oxley Act of 2002, rules adopted by the SEC, and rules of the NYSE.

This report has been furnished by our audit committee to our board of directors.

96. Defendants' statements misleadingly suggested that the Board: (i) maintained sufficient compliance, internal control, review and reporting programs to identify and address misconduct; (ii) was unaware of existing material risks that could affect the Company; and (iii) maintained risk management practices. The 2015 Proxy omitted any disclosures that: (i) the Company lacked effective internal control over its financial reporting; (ii) the Company's financial statements starting in the first quarter of 2014 overstated the Company's estimated results of operations; (iii) the Company's financial statements contained errors relating to unrecorded expenses from unreconciled balance sheet accounts, including cash, driver and other receivables, and line haul and other driver payables; (iv) the Company improperly accounted for the goodwill assets acquired through the Company's acquisition strategy; and (v) the Company's Morgan Southern and Bruenger subsidiaries were engaged in improper accounting practices.

97. The Board and Audit Committee did not exercise active and appropriate oversight over the Company's risk management and financial statements. Most importantly, the Company was not correctly accounting for its revenues and earnings, and therefore, its financial statements were not appropriate to include in the Company's annual report. Defendants DiBlasi, Doerr, Kennedy, Rued, Staley, Urkiel, Utrup and Vijums were negligent in making these materially misleading statements in the 2015 Proxy.

98. The 2015 Proxy harmed Roadrunner by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors. As a result of defendants' misleading statements in the 2015 Proxy, Roadrunner's stockholders voted to re-elect defendants Urkiel, Utrup and Vijums to Roadrunner's Board.

**The False and Misleading 2016 Proxy**

99.     On April 6, 2016, defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Vijums and Ward caused Roadrunner to file with the SEC its 2016 Proxy in connection with the 2016 Annual Meeting of Stockholders, to be held on May 18, 2016. In the 2016 Proxy, defendants solicited stockholder votes to, among other things, re-elect defendants DiBlasi, Kennedy and Rued to the Board. Defendants negligently issued materially misleading statements with respect to these solicited votes. Plaintiff disclaims any claim of fraud or knowing wrongdoing in connection with the misleading statements in the 2016 Proxy.

100.    In support of re-electing defendants DiBlasi, Kennedy and Rued, the 2016 Proxy claimed that: (i) the Board was engaged in active risk oversight of the Company, including focusing on the risk in the Company's operations and finances; (ii) the Audit Committee exercised oversight of the Company's financial statements; and (iii) Roadrunner's financial statements were accurate, and therefore the Board's approval of their inclusion in the Company's annual report was appropriate. The 2016 Proxy stated:

> **Role of the Board of Directors in Risk Management and Oversight**
>
> While our management is primarily responsible for managing risk, ***our board of directors and each of its committees plays a role in overseeing our risk management practices. The role of our board of directors in our company's risk oversight process includes receiving reports from members of senior management on areas of material risk to our company, including operational, financial, legal and regulatory, and strategic and reputational risks. Our board of directors receives these reports from the appropriate executive within our organization to enable it to understand our risk identification, risk management, and risk mitigation strategies. This direct communication from management enables our board of directors to coordinate its risk oversight role, particularly with respect to risk interrelationships within our organization.*** Our board of directors believes that its leadership structure has the effect of enhancing its risk oversight function because of the chairman's direct involvement in risk oversight matters and his strong efforts to increase open communication regarding risk issues among directors and the committees of our board of directors. Our board of directors also believes that Mr. Rued's knowledge of our company's business, industry, and risks significantly contributes to our board of directors' understanding and appreciation of risk issues.

Our board of directors allocates responsibility for overseeing risk management for our company among the board and each of its committees. Specifically, the full board oversees significant risks primarily relating to operations, strategy, and finance. In addition, each of our committees considers risks within its area of responsibilities, as follows:

- *Our audit committee is primarily responsible for overseeing matters involving major financial risk exposures and actions management is taking to monitor such risk exposures. This includes risks relating to financial reporting and internal controls; litigation; tax matters; liability insurance programs; and compliance with legal and regulatory requirements and our code of ethics. In addition, our audit committee reviews our quarterly and annual financial reports, including any disclosure in those reports of risk factors affecting our company and business.*

*   *   *

Through the activities of our audit, compensation, and nominating/corporate governance committees, as well as our board of directors' interactions with management concerning our business and the material risks that may impact our company, our board of directors is able to monitor our risk management process and offer critical insights to our management.

*   *   *

## REPORT OF THE AUDIT COMMITTEE OF
## THE BOARD OF DIRECTORS

Our board of directors has appointed an audit committee consisting of three independent directors. All members of our audit committee are able to read and understand fundamental financial statements, including our balance sheet, income statement, and cash flow statement. All members of our audit committee have past employment experience in finance or accounting, requisite professional certification in accounting, or other comparable experience or background which results in each individual's financial sophistication, including being or having been a chief executive officer, chief financial officer, or other senior officer with financial oversight responsibility. Our board of directors has determined that Messrs. Murray, Kennedy, and Urkiel are independent directors, as defined by Section 303A of the NYSE Listed Company Manual, and that Mr. Murray, chairman, qualifies as an "audit committee financial expert."

*The primary responsibility of our audit committee is to assist our board of directors in fulfilling its responsibility to oversee management's conduct of our financial reporting process, including overseeing the financial reports and other financial information provided by us to governmental or regulatory bodies (such as the SEC), the public, and other users thereof; our systems of internal accounting and financial controls; and the annual independent audit of our consolidated financial statements.*

*Management has the responsibility for our consolidated financial statements and the reporting process, including the systems of internal controls.* Our independent registered public accounting firm engaged to conduct the audit of our 2015 financial statements, Deloitte & Touche LLP, is responsible for auditing our consolidated financial statements and expressing an opinion on the conformity of those audited consolidated financial statements with generally accepted accounting principles.

*In fulfilling its oversight responsibilities, our audit committee reviewed and discussed our consolidated audited financial statements with management and the independent registered public accounting firm.* Our audit committee discussed with the independent registered public accounting firm the matters required to be discussed by the Statement on Auditing Standards No. 16, Communication with Audit Committees. *This included a discussion of the independent registered public accounting firm's judgments as to the quality, not just the acceptability, of our accounting principles and such other matters as are required to be discussed with our audit committee under generally accepted auditing standards.* In addition, our audit committee received from the independent registered public accounting firm written disclosures and the letter required by applicable requirements of the Public Company Accounting Oversight Board regarding the independent registered public accounting firm's independence. Our audit committee also discussed with the independent registered public accounting firm their independence from management and our company, including the matters covered by the written disclosures and letter provided by the independent registered public accounting firm. Our audit committee has concluded that Deloitte & Touche LLP is independent from our company and management.

Our audit committee discussed with the independent registered public accounting firm the overall scope and plans for their audits. Our audit committee met with the independent registered public accounting firm, with and without management present, to discuss the results of their examinations, their evaluations of our company, the internal controls, and the overall quality of our financial reporting. Our audit committee held nine meetings during the fiscal year ended December 31, 2015.

*Based on the reviews and discussions referred to above, our audit committee recommended to our board of directors, and our board of directors approved, that our audited consolidated financial statements be included in the Annual Report on Form 10-K for the year ended December 31, 2015 for filing with the SEC.*

Our board of directors has adopted a written charter for our audit committee that reflects, among other things, requirements of the Sarbanes-Oxley Act of 2002, rules adopted by the SEC, and rules of the NYSE.

This report has been furnished by our audit committee to our board of directors.

101.     Defendants' statements misleadingly suggested that the Board: (i) maintained sufficient compliance, internal control, review and reporting programs to identify and address misconduct; (ii) was unaware of existing material risks that could affect the Company; and (iii) maintained risk management practices.  The 2016 Proxy omitted any disclosures that: (i) the Company lacked effective internal control over its financial reporting; (ii) the Company's financial statements starting in the first quarter of 2014 overstated the Company's estimated results of operations; (iii) the Company's financial statements contained errors relating to unrecorded expenses from unreconciled balance sheet accounts, including cash, driver and other receivables, and line haul and other driver payables; (iv) the Company improperly accounted for the goodwill assets acquired through the Company's acquisition strategy; and (v) the Company's Morgan Southern and Bruenger subsidiaries were engaged in improper accounting practices.

102.     The Board and Audit Committee did not exercise active and appropriate oversight over the Company's risk management and financial statements.  Most importantly, the Company was not correctly accounting for its revenues and earnings, and therefore, its financial statements were not appropriate to include in the Company's annual report.  Defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Vijums and Ward were negligent in making these materially misleading statements in the 2016 Proxy.

103.     The 2016 Proxy harmed Roadrunner by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors. As a result of defendants' misleading statements in the 2016 Proxy, Roadrunner's stockholders voted to re-elect defendants DiBlasi, Kennedy and Rued to Roadrunner's Board.

**The Truth Regarding Roadrunner's Lack of Internal Controls**

104.     The full extent of the Company's lack of internal controls over its financial reporting and defendants' wrongdoing emerged on January 30, 2017.  After the markets had closed that day,

Roadrunner issued a press release entitled "Roadrunner Transportation Systems Announces Restatement of Prior Period Financial Statements," attached to a Current Report on Form 8-K filed with the SEC. In the press release, the Company admitted that *all* of its financial statements filed with the SEC in its Annual Reports on Form 10-K for the fiscal years ended December 31, 2014 and 2015 and Quarterly Reports on Form 10-Q for the quarters ended March 31, 2014 to September 30, 2016 could not be relied upon. Finally acknowledging to the public that it lacked internal controls for at least the previous three years, the Company announced that accounting discrepancies existed at two of its operating subsidiaries, Morgan Southern and Bruenger, acquired by the Company in 2011. The accounting errors would require an estimated $20 million to $25 million adjustment on operating income overall. Roadrunner also disclosed that additional material accounting adjustments could be found during the Company's investigation. The press release stated:

> Roadrunner Transportation Systems, Inc. ("Roadrunner"), a leading asset-light transportation and logistics service provider, announced today that on January 27, 2017 its Audit Committee, after considering the recommendation of management, concluded that, as a result of the information obtained to date in connection with an ongoing investigation described below, the following financial statements and associated reports of Roadrunner's independent registered public accounting firm, Deloitte & Touche LLP, previously filed with the Securities and Exchange Commission ("SEC") should no longer be relied upon:
>
> - the audited consolidated financial statements and unaudited quarterly information included in Roadrunner's Annual Report on Form 10-K for the year ended December 31, 2014;
>
> - the unaudited condensed consolidated financial statements included in Roadrunner's Quarterly Reports on Form 10-Q for the quarters ended March 31, 2014, June 30, 2014, and September 30, 2014;
>
> - the audited consolidated financial statements and unaudited quarterly information included in Roadrunner's Annual Report on Form 10-K for the year ended December 31, 2015;
>
> - the unaudited condensed consolidated financial statements included in Roadrunner's Quarterly Reports on Form 10-Q for the quarters ended March 31, 2015, June 30, 2015, and September 30, 2015; and

- the unaudited condensed consolidated financial statements included in Roadrunner's Quarterly Reports on Form 10-Q for the quarters ended March 31, 2016, June 30, 2016 and September 30, 2016.

Similarly, related press releases, investor presentations or other communications describing Roadrunner's financial statements for these periods should no longer be relied upon.

In November 2016, *Roadrunner was made aware of various potential accounting discrepancies at its Morgan Southern and Bruenger operating subsidiaries*. In response, Roadrunner's Board of Directors immediately commenced an investigation of the discrepancies with the assistance of Greenberg Traurig, LLP, as outside counsel, and RubinBrown LLP, as forensic accountants. *The investigation into these discrepancies is still ongoing*; however, *based on the investigation to date, Roadrunner has identified various accounting errors that it currently estimates will require prior period adjustments to Roadrunner's results of operations of between $20 million and $25 million*.

*These errors principally relate to unrecorded expenses from unreconciled balance sheet accounts including cash, driver and other receivables, and linehaul and other driver payables*. As the investigation is ongoing, the estimated amount is preliminary and could change materially. *The investigation to date has disclosed that the accounting discrepancies may also affect periods prior to the periods set forth above.* Roadrunner has not yet completed its analysis, however, to determine which prior periods may be affected. In addition, Roadrunner has begun to undertake a significant effort to determine if similar discrepancies and internal control deficiencies impacted other operating entities that were not part of the investigation. Therefore, *there may be additional accounting adjustments as a result of these efforts and such adjustments may be material.*

In addition, in conjunction with the investigation, Roadrunner is reassessing its internal controls over financial reporting and its compliance programs. *The result of this reassessment could lead Roadrunner to conclude that there were deficiencies in Roadrunner's internal controls over financial reporting that constitute material weaknesses* and would therefore effect the conclusions regarding effectiveness previously expressed in Item 9A, Controls and Procedures, of Roadrunner's Annual Report on Form 10-K for the year ended December 31, 2015.

105. Further, in the Form 8-K section entitled "Material Impairments," the Company revealed that it would record a non-cash goodwill impairment charge in the range of $175 million to $200 million, further demonstrating the damage done to the Company's reputation.

106.    On this news, Roadrunner's stock price plunged more than 31%, or $3.62 per share, on January 31, 2017, to close at $7.92 per share compared to the previous trading day's closing of $11.54 per share, erasing almost $138.8 million in market capitalization in a single day.

107.    On January 31, 2017, defendants held an earnings conference call for investors and analysts. Defendant Stoelting acknowledged that "high levels of growth had put some stress and stretched the organizational structure that was in place," and that the Company could have "more oversight from a corporate point of view."

108.    Also in the wake of the Company's revelation that it would need to refile its Annual and Quarterly Reports on Form 10-K and Form 10-Q, respectively, for the previous three years, on March 29, 2017, Roadrunner terminated its CFO, defendant Armbruster. On May 24, 2017, the Company announced that it had appointed Terence R. Rogers to be its CFO, replacing defendant Armbruster.

109.    On June 12, 2017, the Company filed a Current Report on Form 8-K with the SEC announcing that on May 18, 2017, the Board had increased its size from ten to twelve members. The Form 8-K also advised that on June 6, 2017, the Board appointed defendants Dobak and Kittle to the Board without a stockholder vote. Defendant Dobak is the current CEO of Dicom, a competing transportation service corporation.

110.    To date, Roadrunner has not filed an annual report with the SEC for the fiscal year ended December 31, 2016, instead filing a Notification of Late Filing on Form 12b-25 on March 17, 2017, notifying the SEC that its Form 10-K would be filed late. In the Form 12b-25, the Company acknowledged that it had experienced delays in assembling all the required information for its audited financial statements due to the delays mentioned above. The price of Roadrunner stock has yet to recover, remaining below $8.00 per share as of the filing of this complaint.

**Reasons the Statements Were Improper**

111.    The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material adverse facts, which defendants knew, consciously disregarded, or were reckless in not knowing:

   (a)    the Company lacked effective internal control over its financial reporting;

   (b)    the Company's financial statements starting in the first quarter of 2014 overstated the estimated results of operations;

   (c)    the Company's financial statements contained errors relating to unrecorded expenses from unreconciled balance sheet accounts, including cash, driver and other receivables, and linehaul and other driver payables;

   (d)    the Company improperly accounted for the goodwill assets acquired through the Company's acquisition strategy;

   (e)    the Company's Morgan Southern and Bruenger subsidiaries were engaged in improper accounting practices; and

   (f)    as a result of the foregoing, the officers' and directors' representations concerning the Company's internal control of its financial reporting were improper.

**Defendants Failed to Hold an Annual Meeting of Stockholders
in Violation of the Company's By-Laws and Delaware Law**

112.    Under Article 1, §1.2 of the Company's Second Amended and Restated By-Laws, titled "Annual Meetings," the Board is required to designate a time for "annual meetings of stockholders." Further, §211 requires that an annual stockholders meeting be held within 13 months of the previous meeting.

113.    In the aftermath of Roadrunner's revelations regarding its accounting issues, the Company has not provided notice to stockholders of any impending annual meeting or Board election. On March 17, 2017, the Company filed a Notification of Late Filing on Form 12b-25 with

SEC, providing notice that the Company would not be filing its Annual Report on Form 10-K on time. Also, the Company has yet to file a 2017 Proxy Statement with the SEC announcing its annual meeting.

114. Most importantly, to date, the Company still has not held its Annual Meeting of Stockholders for 2017. In fact, the last time the Company held its Annual Meeting of Stockholders was on May 18, 2016, more than 13 months ago. Thus, Roadrunner is in violation of its By-Laws and Delaware law, wrongfully denying the Company's stockholders their important right to voice their frustration at an annual meeting or by withholding their votes for the directors that have breached their fiduciary duties.

115. This failure to hold an Annual Meeting of Stockholders is particularly egregious here given the misleading 2015 Proxy and 2016 Proxy (collectively, the "Proxies") and the additional appointments to the Board.

### Defendants Violated §8 by Appointing Defendant Dobak to the Roadrunner Board

116. Roadrunner's newly appointed director, defendant Dobak, is an interlocking director within the meaning of §8. On June 6, 2017, the Board appointed defendant Dobak, CEO of Roadrunner's competitor, Dicom, to the position of director on the Board without an election of the stockholders.

117. Upon information and belief, Roadrunner and the privately traded Dicom each have a combined capital, surplus and undivided profit exceeding $32,914,000. Both are engaged in commerce. The two companies compete with one another, providing, among other things, transportation logistics, full truckload and LTL services, and TMS in the United States.

118. Roadrunner provides transportation services through a suite of global supply chain solutions, including TL, customized and expedited LTL, intermodal solutions, freight consolidation, inventory management, expedited services, air freight, international freight

forwarding, customs brokerage and TMS, primarily in the United States. The Company splits its operations into three segments: TL, LTL and Global Solutions. According to the Company's most recent Annual Report on Form 10-K filed with the SEC on March 1, 2016, the Company reported total revenues for fiscal year 2015 of nearly $2 billion. TL accounted for 58.9% of the Company's revenues at approximately $1.2 billion. The next largest segment at 25.9% of revenues, LTL, accounted for $516 million of the Company's total revenue. Global Solutions provided an additional $330 million, or 16.6%, of total revenues.

119. Dicom also provides transportation services that overlap with the services provided by Roadrunner. Dicom engages in commerce and provides full TL, LTL and TMS services throughout North America, including in the United States. Upon information and belief, Dicom has capital, surplus and undivided profits exceeding $32,914,000.

120. Further, upon information and belief, Roadrunner's and Dicom's competitive annual sales exceed §8's exemptions. Roadrunner's and Dicom's competitive annual sales: (i) exceed $3,291,400; (ii) are more than 2% of total sales for either corporation; and (iii) are more than 4% of total sales for each corporation.

121. The Board breached its fiduciary duty to the Company by causing it to break the law.

**INSIDER TRADING ALLEGATIONS**

122. From 2013 until early 2017, while Roadrunner stock was artificially inflated due to defendants' breaches of fiduciary duties, certain defendants sold nearly all of their personally held Roadrunner shares, reaping over $172 million in insider trading proceeds. Defendants' illegal insider trading was suspicious in both timing and amount.

123. First, the sales were suspicious in timing because many of the sales occurred near the height of Roadrunner's artificially inflated stock price. Moreover, from the Company's May

2010 IPO until the beginning of the relevant period, none of the insider trading defendants sold *any* of their personal shares of Roadrunner stock. It was only after defendants realized that the Company's operations were not operating as advertised that the massive insider trading began.

124.    Second, the sales were suspicious in amount. Each of the defendants (described below) who engaged in insider trading sold from 40% to 93% of their holdings. And these sales were after nearly three years of selling 0% of their holdings. Defendants' insider sales are as follows:

(a)    Between May 2013 and August 2015, defendant Rued reported selling 6.445 million shares for $159.2 million in illicit insider trading proceeds. These sales amounted to 45% of Rued's holdings. Moreover, Rued's insider trading alone demonstrates that he is interested in the outcome of this litigation by personally benefitting from his breach of fiduciary duty, rendering any demand upon him futile.

(b)    Between May 2013 and March 2014, defendant DiBlasi sold 179,177 shares for illegal insider trading proceeds of $4.6 million. These sales amounted to 40% of DiBlasi's holdings. Moreover, DiBlasi's insider trading alone demonstrates that he is interested in the outcome of this litigation by personally benefitting from his breach of fiduciary duty, rendering any demand upon him futile.

(c)    Between May 2013 and November 2013, defendant Dobak sold 47,424 shares for illegal insider trading proceeds of $1.2 million. These sales amounted to 93% of Dobak's holdings.

(d)    Between May 2013 and February 2015, defendant Armbruster sold 189,852 shares for illegal insider trading proceeds of over $5 million. These sales amounted to 76% of Armbruster's holdings.

(e)     Between May 2013 and February 2015, defendant van Helden sold 103,234

shares for illegal insider trading proceeds of over $2.7 million. These sales amounted to 51% of

van Helden's holdings.

## DAMAGES TO ROADRUNNER

125.     As a result of defendants' improprieties, Roadrunner disseminated improper public

statements concerning the adequacy of the Company's internal controls over its financial reporting

and its growth-through-acquisition corporate strategy. These improper statements have devastated

Roadrunner's credibility as reflected by the Company's approximately $138.8 million, or 31%,

market capitalization loss.

126.     Defendants' unlawful course of conduct has also subjected the Company to

potentially hundreds of millions of dollars in damages in connection with securities class action

lawsuits filed in the U.S. District Court for the Eastern District of Wisconsin. The class action

lawsuits allege that the Company and certain individual defendants violated securities laws by

repeatedly misrepresenting that the Company had effective internal control over its financial

reporting and disclosure procedures, when in fact the Company's financial statements could not be

relied upon.

127.     Roadrunner's performance issues also damaged its reputation within the business

community and in the capital markets. In addition to price, Roadrunner's current and potential

customers consider a company's trustworthiness, stability and ability to accurately describe its

business operations. As evidence, the Company admitted that it would record a non-cash goodwill

impairment charge in the range of $175 million to $200 million. Investors are less likely to invest

in companies that disseminate improper statements, fail to comply with their own internal protocols

and external regulations, and are uncertain about their own financial conditions. In the wake of the

revelation that the Company miscalculated its cash flow leverage ratio due to accounting errors,

Roadrunner's ability to raise equity capital or debt on favorable terms in the future is also now impaired. In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by defendants have materially increased the perceived risks of investing in and lending money to the Company.

128. Further, as a direct and proximate result of defendants' actions, Roadrunner has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a) costs incurred from defending and paying any settlement in the class actions for violations of federal securities laws;

(b) costs incurred to investigate wrongdoing; and

(c) costs incurred from compensation and benefits paid to the defendants who have breached their duties to Roadrunner.

## DERIVATIVE ALLEGATIONS

129. Plaintiff incorporates ¶¶1-128.

130. Plaintiff brings this action derivatively in the right and for the benefit of Roadrunner to redress injuries suffered, and to be suffered, by Roadrunner as a direct result of violations of the federal securities law, breach of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof by defendants. Roadrunner is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

131. Plaintiff will adequately and fairly represent the interests of Roadrunner in enforcing and prosecuting its rights.

132. Plaintiff was a stockholder of Roadrunner at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Roadrunner stockholder.

133.   The current Board of Roadrunner consists of the following 12 individuals: defendants DiBlasi, Dobak, Doerr, Kennedy, Kittle, Murray, Rued, Staley, Stoelting, Urkiel, Vijums and Ward.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act, as set forth below.

134.   Any suit by the directors of Roadrunner to remedy the wrongs complained of herein would expose defendants themselves and their friends and business allies to significant personal liability for their breach of fiduciary duties and other misconduct. Defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Vijums and Ward have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors for the wrongful conduct described herein. Defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Vijums and Ward are accused of wrongdoing and recommending, approving and ratifying the materially false and misleading statements identified herein and, thus, face a substantial likelihood of liability, thereby rendering any demand upon them futile.

135.   Further, defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Vijums and Ward breached their fiduciary duties of loyalty by making improper statements in the Company's press releases and SEC filings regarding the effectiveness of the Company's internal controls over its financial reporting.  Specifically, in public filings with the SEC from May 2014 to November 2016, the Board averred to the public that the Company's growth-through-acquisition strategy had a positive effect on its revenues and that the strategy had a material impact on the Company's overall growth.  The Board also claimed that there were no material changes to its internal control over financial reporting or disclosures.  This despite the fact that the financial statements during this three-year period overstated the estimated results of operations; contained errors relating to unrecorded expenses from unreconciled balance sheet accounts, including cash,

driver and other receivables, and linehaul and other driver payables; and the Company's Morgan Southern and Bruenger subsidiaries were engaged in improper accounting practices. In fact, the Company has been forced to record a non-cash goodwill impairment charge in the range of $175 million to $200 million from its acquisition of Morgan Southern and Bruenger. As a result, the Company had to acknowledge that the financial information contained in its public filings for the last three years could not be relied upon.

136.    Furthermore, defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Vijums and Ward allowed Roadrunner to continue to make improper statements regarding the effectiveness of the Company's internal controls over its financial reporting even though they knew that there were pervasive accounting issues prior to the revelation of systematic and pervasive accounting errors on January 30, 2017. For instance, on November 10, 2016, the Company filed a Notification of Late Filing on Form 12b-25 notifying the SEC that it could not file its third quarter 2016 Form 10-Q due to a significant accounting error. This demonstrates a sustained and systematic failure of the Board to exercise oversight of its internal controls over financial reporting. Accordingly, demand is excused because a majority of the Board faces a substantial likelihood of liability.

137.    Defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Vijums and Ward are responsible for the negligently made statements in the materially misleading Proxies. It is against public policy to indemnify individuals for violations of §14(a) of the Exchange Act. Accordingly, an indemnification provided by the Company to defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Vijums and Ward does not protect them for violations of §14(a) in the Proxies. Accordingly, defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Vijums and Ward face a substantial likelihood of liability, excusing a demand.

138. In fact, the Proxies specifically stated that the Audit Committee reviewed the Company's financial statements and recommended their approval for inclusion in Roadrunner's annual reports. The Proxies also stated that the Board approved the inclusion of the incorrect financial statements in the Company's annual reports. In particular, on behalf of defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Vijums and Ward, the Proxies substantiated that the Audit Committee had reviewed the Company's audited financial statements for fiscal years 2014 and 2015 and recommended to the Board, and the Board approved, the inclusion of the audited financial statements in the Company's Annual Reports on Form 10-K for the fiscal years ended December 31, 2014 and 2015, for filing with the SEC.

139. Moreover, demand is excused because a majority of the directors, ten out of the current expanded twelve directors, committed the *ultra vires* act of appointing the interlocking director defendant Dobak, CEO of Roadrunner's competitor, Dicom, to the Board without a stockholder vote. As stated above, this act violates §8. These ten directors are: defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Vijums and Ward. As a result, a majority of the current Roadrunner Board faces a substantial likelihood of liability under §8. Furthermore, defendant Dobak is incapable of impartially considering a demand to commence and vigorously prosecute this action because he has an interest in maintaining his position on the Board. Demand on these current Board members is therefore excused.

140. Further, the Compensation Committee of the Board, consisting of defendants Doerr, Staley and Urkiel, is responsible for approving Roadrunner's executive officers' compensation, including that of defendant DiBlasi. In 2014 and 2015, defendant DiBlasi received $1,037,316 and $1,214,173, respectively, in total compensation based on his employment as an executive of Roadrunner. As the members of the Compensation Committee singularly control approval of defendant DiBlasi's compensation, DiBlasi will not institute this action against defendants Doerr,

Staley and Urkiel. To do so would jeopardize his personal financial compensation. Thus, demand on defendant DiBlasi is futile.

141. According to the Company's Compensation Committee Charter, the Compensation Committee shall "[e]stablish and review the overall compensation philosophy of the Company" and "[r]eview and recommend to the full Board of Directors compensation of directors as well as directors' and officers' indemnification and insurance matters." Moreover, Roadrunner's Compensation Committee shall "[r]eview and approve the Company's corporate goals and objectives relevant to the compensation for the CEO and other executive officers, including annual performance objectives" and "make recommendations to the Board of Directors with respect to, or, as directed by the Board of Directors, determine and approve, compensation, incentive-compensation plans, and equity-based plans for all other executive officers of the Company." Thus, because each director defendant approves each other director defendant's cash compensation, each director defendant would not institute this action against the other director defendants, as it would jeopardize their personal compensation. Thus, demand on each of Doerr, Staley and Urkiel is futile.

142. Defendants Kennedy, Murray, Urkiel and Utrup, as members of the Audit Committee, reviewed and approved the improper statements and earnings guidance. Defendants Kennedy, Murray and Urkiel are held to higher standards of financial expertise. The Audit Committee's Charter provides that the members must oversee "the accounting and financial reporting processes of the Company and audits of the financial statements of the Company." Moreover the Audit Committee's Charter provides that it is responsible for providing assistance to the Board with respect to its oversight of the integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, the qualifications and independence of the Company's independent auditor, and the performance of the Company's internal audit function and independent auditor. Furthermore, the Audit Committee is required to

report to the Board any major issues as to the adequacy of the Company's internal controls and any specific audit steps adopted in light of material control deficiencies. Thus, defendants Kennedy, Murray, Urkiel and Utrup were responsible for knowingly or recklessly allowing the improper statements related to the Company's financial reporting. Despite their knowledge or reckless disregard, defendants Kennedy, Murray, Urkiel and Utrup caused these improper statements. Accordingly, defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein. Thus, defendants Kennedy, Murray, Urkiel and Utrup face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

143. The principal professional occupation of defendants DiBlasi, Stoelting and Vijums is their employment with Roadrunner, pursuant to which they have received and continue to receive substantial monetary compensation and other benefits as alleged above. Accordingly, defendants DiBlasi, Stoelting and Vijums lack independence from defendants Rued, Staley, Doerr, Kennedy, Murray, Urkiel and Ward due to their interest in maintaining their executive positions at Roadrunner. This lack of independence renders defendants DiBlasi, Stoelting and Vijums incapable of impartially considering a demand to commence and vigorously prosecute this action because they have an interest in maintaining their principal occupation and the substantial compensation they receive in connection with that occupation. Demand is futile as to defendants Stoelting, DiBlasi and Vijums.

144. Defendants Rued and Vijums are also employees of HCI. Defendant Rued is the co-founder and a managing partner at HCI, and defendant Vijums is a managing director at HCI. As defendants admit in Roadrunner's Proxy Statements from 2013 to 2016, defendants Rued and Vijums are not considered independent directors as a result of their relationships with HCI, which is affiliated with investment funds that hold a large amount of Roadrunner stock. Defendants

further admit in Proxy Statements from 2013 to 2016 that Roadrunner paid HCI fees and remunerations for services performed in conjunction with acquisitions and debt financing in accordance with advisory agreements. Accordingly, defendants Rued and Vijums lack independence from defendants DiBlasi, Staley, Stoelting, Doerr, Kennedy, Murray, Urkiel and Ward due to their direct and indirect pecuniary interest in Roadrunner through their employment with HCI. This lack of independence renders defendants Rued and Vijums incapable of impartially considering a demand to commence and vigorously prosecute this action because they have an interest in maintaining their principal occupation and the substantial compensation they receive in connection with that occupation. Demand is futile as to defendants Rued and Vijums.

145.    Plaintiff has not made any demand on the other stockholders of Roadrunner to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)    Roadrunner is a publicly held company with over 38.3 million shares outstanding and thousands of stockholders as of November 11, 2016;

(b)    making demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of stockholders; and

(c)    making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

### For Violations of §14(a) of the Exchange Act
### Against Defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Utrup, Vijums and Ward

146.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

147. Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

148. The Proxies violated §14(a) and Rule 14a-9 because they solicited Roadrunner shareholder votes for, *inter alia*, director re-election and executive compensation, while simultaneously misrepresenting and/or failing to disclose that: (i) the Company lacked effective internal control over its financial reporting; (ii) the Company's financial statements starting in the first quarter of 2014 overstated the Company's estimated results of operations; (iii) the Company's financial statements contained errors relating to unrecorded expenses from unreconciled balance sheet accounts, including cash, driver and other receivables, and linehaul and other driver payables; (iv) the Company improperly accounted for the goodwill assets acquired through the Company's acquisition strategy; and (v) the Company's Morgan Southern and Bruenger subsidiaries were engaged in improper accounting practices. Defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Utrup, Vijums and Ward issued, caused to be issued, and participated in the issuance of these materially false and misleading written statements to stockholders in the Proxies. By reasons of the conduct alleged herein, defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Utrup, Vijums and Ward violated §14(a) of the Exchange Act. As a direct and proximate result of these violations, stockholders voted in favor of re-electing defendants DiBlasi, Kennedy, Rued, Urkiel, Utrup and Vijums to the Board. Defendants DiBlasi, Kennedy, Rued, Urkiel, Utrup and Vijums' re-election led to the continuation of the wrongful practices described herein.

73

149.    In the exercise of reasonable care, defendants should have known that the statements contained in the Proxies were materially false and misleading. In the exercise of reasonable care, defendants should have known that the statements contained in the Proxies were materially false and misleading, and/or that the Proxies omitted material information. The Company was damaged as a result of defendants' material misrepresentations and omissions in the Proxies.

150.    Plaintiff, on behalf of Roadrunner, thereby seeks relief for damages inflicted upon the Company in connection with the improper election of defendants DiBlasi, Kennedy, Rued, Urkiel, Utrup and Vijums based upon the false and misleading Proxies, and also seeks new director elections on the basis of a special proxy with appropriate corrective disclosures.

## COUNT II

### For Breach of Fiduciary Duty Against All Defendants

151.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

152.    Defendants owed and owe Roadrunner fiduciary obligations. By reason of their fiduciary relationships, defendants owed and owe Roadrunner the highest obligation of good faith, fair dealing, loyalty and due care.

153.    Defendants, and each of them, violated and breached their fiduciary duties of candor, good faith and loyalty. More specifically, defendants violated their duty of good faith by creating a culture of lawlessness within Roadrunner and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

154.    Defendants knew, or were reckless or grossly negligent in disregarding, the illegal activity of such substantial magnitude and duration. Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) the Company lacked effective internal control over its financial reporting; (ii) the Company's financial statements starting in the first quarter of 2014 overstated the Company's estimated results of operations; (iii) the Company's financial statements contained

errors relating to unrecorded expenses from unreconciled balance sheet accounts including cash, driver and other receivables, and linehaul and other driver payables; and (iv) the Company's Morgan Southern and Bruenger subsidiaries were engaged in improper accounting practices. Accordingly, defendants breached their duty of care and loyalty to the Company.

155. Defendants DiBlasi, Doerr, Evans, Kennedy, Rued, Stoelting, Staley, Murray, Urkiel, Utrup, Vijums and Ward, as directors of the Company, owed Roadrunner the highest duty of loyalty. These defendants breached their duty of loyalty by recklessly permitting the improper statements. Defendants DiBlasi, Doerr, Evans, Kennedy, Rued, Stoelting, Staley, Murray, Urkiel, Utrup, Vijums and Ward knew or were reckless in not knowing that: (i) the Company lacked effective internal control over its financial reporting; (ii) the Company's financial statements starting in the first quarter of 2014 overstated the Company's estimated results of operations; (iii) the Company's financial statements contained errors relating to unrecorded expenses from unreconciled balance sheet accounts including cash, driver and other receivables, and linehaul and other driver payables; and (iv) the Company's Morgan Southern and Bruenger subsidiaries were engaged in improper accounting practices. Accordingly, defendants DiBlasi, Doerr, Evans, Kennedy, Rued, Stoelting, Staley, Murray, Urkiel, Utrup, Vijums and Ward breached their duty of loyalty to the Company.

156. Defendants DiBlasi, Doerr, Kennedy, Murray, Rued, Staley, Stoelting, Urkiel, Vijums and Ward breached their fiduciary duty and committed the *ultra vires* act of appointing the interlocking defendant Dobak, CEO of Roadrunner's competitor, Dicom, to the Board. As stated above, defendant Dobak's service on the Board violates §8.

157. Defendants Kennedy, Murray, Urkiel and Utrup, as members of the Audit Committee, breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless

in not knowing contained improper statements and omissions. These defendants completely and utterly failed in their duty of oversight, and defendants Kennedy, Murray, Urkiel and Utrup failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

158. As a direct and proximate result of defendants' breach of their fiduciary obligations, Roadrunner has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

159. Plaintiff, on behalf of Roadrunner, has no adequate remedy at law.

## COUNT III

### For Waste of Corporate Assets Against All Defendants

160. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

161. As a result of defendants' reckless growth-through-acquisition strategy, the Company spent hundreds of millions of dollars purchasing various companies to prop up Roadrunner's reported revenues and earnings. In the course of this strategy, the Company purchased Morgan Southern and Bruenger, companies with on-going accounting issues. As a direct result of these reckless purchases, Roadrunner was forced to announce that its financial reporting filed with the SEC from May 2014 to November 2016 could not be relied upon, and that the Company would record a non-cash goodwill impairment charge in the range of $175 million to $200 million.

162. As a result of defendants' failure to implement adequate internal controls to ensure that the Company's SEC filings were accurate, Roadrunner is subject to numerous securities fraud class action lawsuits. Defendants have caused Roadrunner to waste its assets by forcing it to defend itself in the ongoing litigation. In addition, Roadrunner faces potential liability for any costs from a potential settlement or adverse judgment in the litigation.

163. In addition, defendants have caused Roadrunner to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors in breach of their fiduciary duty.

164. As a result of the waste of corporate assets, defendants are liable to the Company.

165. Plaintiff, on behalf of Roadrunner, has no adequate remedy at law.

## COUNT IV

### For Unjust Enrichment Against Defendants Stoelting, DiBlasi, Staley, Doerr, Kennedy, Murray, Urkiel, Ward, Utrup, Armbruster and van Helden

166. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

167. By their wrongful acts and omissions, the defendants named in this Count were unjustly enriched at the expense of and to the detriment of Roadrunner. These defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Roadrunner.

168. Plaintiff, as a stockholder and representative of Roadrunner, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

169. Plaintiff, on behalf of Roadrunner, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Roadrunner, demands judgment as follows:

A. Awarding monetary damages against all defendants, jointly and severally, for all damages and losses suffered, and to be suffered, as a result of the acts and transactions complained of herein, together with pre-judgment interest, to ensure that defendants do not participate therein or benefit thereby;

B.  Directing Roadrunner to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for a shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.  Directing all defendants to account for all damages caused by them and all profits, special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all fees, salaries, performance-based compensation, benefits and insider sales proceeds, and imposing a constructive trust thereon;

D.  Awarding punitive damages;

E.  Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, and accountants' and experts' fees, costs and expenses; and

F.  Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: December 22, 2017                KERKMAN WAGNER & DUNN


                                        s/K. Scott Wagner
                                        _____
                                        K. SCOTT WAGNER
                                        839 N. Jefferson Street, Suite 400A
                                        Milwaukee, WI 53202
                                        Telephone: 414/277-8200
                                        Facsimile: 414/254-752

ROBBINS GELLER RUDMAN
   & DOWD LLP
TRAVIS E. DOWNS III
BENNY C. GOODMAN III
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
FELIPE J. ARROYO
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: 619/525-3990
619/525-3991 (fax)

Attorneys for Plaintiff

## VERIFICATION

I, Michelle Kichline, as Chair of the Chester County Employees Retirement Fund ("Chester County"), acting on behalf of and with the consent of the Chester County Board of Trustees, hereby verify that I am familiar with the allegations in the Verified Shareholder Derivative Complaint for Violation of Federal Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets and Unjust Enrichment and that the foregoing is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Chester County Employees Retirement Fund

DATED: _12 / 21 / 17_

_Michelle Kichline_
Michelle Kichline, Chair